No. 00-183

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 33

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JAMES WILLIAM BOYER,

Defendant and Appellant.


APPEAL FROM: District Court of the Seventeenth Judicial District,
In and for the County of Phillips,
The Honorable John C. McKeon, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Michael G. Moses (argued), Moses Law Firm, Billings, Montana

For Respondent:

Hon. Mike McGrath, Attorney General; Mark W. Mattioli (argued),
Assistant Attorney General, Helena, Montana

Ed Amestoy, Phillips County Attorney; Dan O'Brien, Deputy County
Attorney, Malta, Montana

Argued: April 20, 2001
Submitted: May 3, 2001
Decided: February 26, 2002
Filed:

_____
Clerk


Justice Jim Regnier delivered the Opinion of the Court.

¶1 James William Boyer appeals from an order issued by the Seventeenth Judicial District Court, Phillips County, which denied his motion to suppress evidence. We affirm.

¶2 The sole issue on appeal is whether the District Court erred in denying Boyer's motion to suppress.


## BACKGROUND


¶3 On Sunday, April 18, 1999, Warden Steve Jones of the Department of Fish, Wildlife and Parks (Department) was patrolling by boat a portion of the Missouri River bordering Phillips County, Montana. Jones observed a boat anchored in the river which appeared unoccupied. Concerned for the prospective passengers' safety, Jones pulled his boat alongside the anchored boat and observed Boyer lying on the floor. Boyer sat up and told Jones he was just waking up from a nap. Jones inquired into Boyer's safety and Boyer stated that he was okay.

¶4 Upon further questioning, Boyer indicated that he had been fishing since Friday and produced his Montana fishing license. Additionally, Boyer disclosed that he had fish in his possession, stored in the boat's live well. Jones requested to see his catch. Boyer suggested Jones could inspect the catch later in the evening at a boat launch. Jones rejected this suggestion and Boyer reluctantly removed eight fish from the live well. At that time, the combined possession limit for sauger and walleye was ten fish.

¶5 In order to inspect the fish, Jones tied the boats together and stepped onto the transom, an exterior platform attached to the rear of Boyer's boat. From this vantage point, Jones could see that Boyer's live well, which was open, contained additional fish in excess of the legal possession limit. Boyer allowed Jones to remove the additional fish. Jones determined that Boyer had nineteen dead sauger and walleye in his possession. Jones confiscated the excess fish and issued Boyer a notice to appear for the possession of unlawfully killed game fish.

¶6 Boyer was convicted in Justice Court of possession of unlawfully killed game fish in violation of § 87-3-112(2), MCA. Boyer appealed that conviction to the District Court and filed a motion to suppress the evidence. After a hearing on the matter, the District Court found that no search occurred as Boyer did not have a reasonable expectation of privacy in his boat on a public waterway. Therefore, the District Court denied Boyer's motion. It is from this denial that Boyer appeals.


## STANDARD OF REVIEW


¶7 In reviewing a district court's denial of a motion to suppress evidence, we determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law is correct. State v. Reesman, 2000 MT 243, ¶ 18, 301 Mont. 408, ¶ 18, 10 P.3d 83, ¶ 18.

## DISCUSSION

¶8 Did the District Court err in denying Boyer's motion to suppress?

¶9 On appeal, Boyer argues that several of the District Court's findings constitute reversible error. First, Boyer argues that Jones initiated an investigatory stop on Boyer without the requisite particularized suspicion of wrongdoing. Further, Boyer insists that Jones unlawfully compelled production of his fishing license and catch. Finally, Boyer claims Jones performed an illegal search in stepping onto the back of his boat to inspect the fish and live well. We address each of Boyer's contentions below.

A. Jones' Initial Advance on Boyer's Boat

¶10 Boyer contends Jones' initial advance on his boat constituted an unlawful investigatory stop. Boyer argues that the District Court should have suppressed the inculpatory evidence revealed by Jones' inspection because Jones admitted having no particularized suspicion that the boat occupants had committed, were committing, or were about to commit an offense. See Section 46-5-401, MCA. Boyer's reliance on the investigatory stop statute and case law in support of his position is ill founded.

¶11 We have previously stated that:

Legal stops can also occur in noncriminal, noninvestigatory contexts. For example nothing prevents a police officer from making a stop to deliver an emergency message, assist a stranded motorist or warn of an impending danger. A police officer can legally stop a vehicle for a bona fide reason which is related to functions within his authority and duties.

> Grinde v. State (1991), 249 Mont. 77, 81, 813 P.2d 473, 476, overruled on other grounds by Bush v. Montana DOJ, Motor Vehicle Div., 1998 MT 270, 291 Mont. 359, 968 P.2d 716. Game wardens, appointed pursuant to § 87-1-501, MCA, are authorized officers with the authority to enforce the laws and adopted rules relating to parks and outdoor recreation contained in Title 23, Chapters 1 and 2 (excepting Part 7 in Chapter 2), MCA. Section 23-1-122(1), MCA. Section 23-2-501, MCA, provides that "[i]t is the policy of this state to promote safety for persons and property in and connected with the use, operation, and equipment of [watercraft] . . . ."

¶12 On January 25, 2000, the District Court held a hearing on Boyer's motion to suppress. At the suppression hearing, Jones testified that an initial concern for the prospective occupants' safety drew his attention to Boyer's boat. From a distance, Boyer's boat appeared unoccupied. As Jones did not see anyone in the boat or on the surrounding shoreline, Jones testified that he was concerned that somebody may have "fallen overboard or something of that nature." Therefore, he inquired into the situation by approaching Boyer's boat.

¶13 Clearly, in approaching Boyer's boat, Jones acted within his express authority. We would never seek to discourage wardens or other law enforcement officials from assisting persons in potential distress. Thus, the District Court correctly determined that Jones lawfully approached Boyer's boat.

B. Request to Produce License and Catch

¶14 Boyer contends that if we conclude Jones' initial advance on his boat was a lawful "welfare check," the welfare check and Jones' corresponding safety concerns ended when Boyer responded that he was okay. In proceeding further, Boyer argues that Jones detained Boyer to request production of his fishing

license. Therefore, Boyer states that Jones needed a particularized suspicion of wrongdoing, as required prior to initiating an investigatory stop, to effectuate the detention and request for Boyer's fishing license. Further, Boyer asserts that since he evinced an expectation of privacy in his catch by placing the fish in a concealed live well, Jones needed probable cause to inspect Boyer's catch. Boyer contends that Jones had neither a particularized suspicion or probable cause. Therefore, Boyer maintains that all of the evidence gathered by Jones following the initial welfare check must be suppressed.

## 1. The License Request

¶15 Section 87-2-109, MCA, provides:
(1) Except as provided in 87-2-114(2), it is unlawful for a person to whom a license or permit has been issued to fish . . . unless the person is carrying the required license, licenses, or permit at the time.

(2) It is unlawful to refuse to exhibit a license or permit and the identification used in purchasing a license or permit for inspection to a warden or other officer requesting to see it.

Further, § 87-1-502(3), MCA, provides that wardens shall see that persons who fish possess the requisite licenses. Clearly, these statutes make no reference to a particularized suspicion requirement prior to requesting production of a game license.

¶16 Here, Boyer was on a fishing boat containing a visible live well. He admitted to Jones that he had been fishing for three days. Jones had the authority to request production of Boyer's fishing license pursuant to § 87-1-502, MCA, and his request fell within the scope of that statute. Fishing or hunting license requests play a vital role in preservation of wildlife and require only a minimal privacy intrusion. However, the Montana Fishing Regulations inform anglers of this intrusion warning that "it is unlawful and a misdemeanor to refuse to show one's fishing license upon demand." We decline Boyer's invitation to imply a particularized suspicion provision into these statutes. Therefore, we hold that a game warden may request production of a valid hunting or fishing license when the circumstances reasonably indicate that an individual has been engaged in those activities.

## 2. The Request to Produce Boyer's Catch

¶17 Boyer argues that Jones performed an unlawful warrantless search by requesting production of Boyer's catch. The request was unlawful, according to Boyer, because Jones did not have probable cause to believe that Boyer had committed a violation at the time Jones requested production of his catch. Boyer contends that § 87-1-506(1)(b), MCA, mandates this probable cause prerequisite. Section 87-1-506(1)(b), MCA, provides:

A warden may search, without a warrant, any tent not used as a residence, any boat, vehicle, box, locker, basket, creel, crate, game bag, or package, or their contents upon

probable cause to believe that any fish and game law or department rule for the protection, conservation, or propagation of game, fish, birds, or fur-bearing animals has been violated. [Emphasis added.]

¶18 The State argues that § 87-1-502(6), MCA, authorizes wardens to make suspicionless stops of persons engaged in hunting and fishing activities to inspect their game. Section 87-1-502(6), MCA, states:

A warden has the authority to inspect any and all fish, game and nongame birds, waterfowl, game animals, and fur-bearing animals at reasonable times and at any location other than a residence or dwelling. Upon request therefor, all persons having in their possession any fish, game and nongame birds, waterfowl, game animals, and fur-bearing animals shall exhibit the same and all thereof to the warden for such inspection.

Boyer asserts that we must read this statute in conjunction with the game wardens' enforcement powers articulated in § 87-1-506(1)(b), MCA. In doing so, Boyer argues that we must imply a "probable cause" standard into § 87-1-502(6), MCA. However, Boyer's position presupposes that the request to exhibit game qualifies as a search for purposes of Article II, Sections 10 and 11 of the Montana Constitution. An impermissible search and seizure only occurs within the meaning of Article II, Section 10 of the Montana Constitution when a reasonable expectation of privacy has been breached. See State v. Scheetz (1997), 286 Mont. 41, 46, 950 P.2d 722, 724-25. The precise inquiry, then, is whether Boyer is entitled to a reasonable expectation of privacy in the game fish he possessed.

¶19 When analyzing search and seizure questions that specially implicate the right of privacy under Montana's Constitution, we consider Sections 10 and 11 of Article II of the Montana Constitution. State v. Bassett, 1999 MT 109, ¶ 23, 294 Mont. 327, ¶ 23, 982 P.2d 410, ¶ 23. Article II, Sections 10 and 11 of the Montana Constitution provide:

Section 10. Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Section 11. Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

¶20 To determine the threshold question of whether there has been an unlawful government intrusion into one's privacy, this Court looks to the following factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the state's intrusion. Bassett, ¶ 24. Where no reasonable expectation of

privacy exists, there is neither a "search" nor a "seizure" within the contemplation of Article II, Sections 10 and 11 of the Montana Constitution. See State v. Bullock (1995), 272 Mont. 361, 377, 901 P.2d 61, 71.

¶21 Boyer argues that placing his fish in a closed live well evinced his actual expectation of privacy in his catch which was reasonable. The State offered no evidence at the suppression hearing contradicting Boyer's subjective expectation of privacy. However, the State argues that Boyer's subjective expectation of privacy is not one which society is willing to recognize as reasonable. We agree for the reasons set forth below.

¶22 Article IX, Section 1(1) of the Montana Constitution provides that "[t]he state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations." To safeguard Montana's wildlife for present and future generations, the Legislature provided for the appointment of game wardens to "enforce the laws of this state and the rules of the [D]epartment with reference to the protection, preservation, and propagation of game and fur-bearing animals, fish, and game birds." Section 87-1-502(2), MCA. Such a system includes the ability of game wardens to inspect game in the field. It also encompasses proper licensing and specific game limitation requirements. Those who apply to the State for permission to harvest or remove Montana's natural game are on notice that they are rightfully subject to such regulations. In summary, our Constitution, laws, and regulations mandate special considerations to assure that our wild places and the creatures that inhabit them are preserved for future generations.

¶23 With these considerations in mind we now consider Boyer's contention that wardens must have probable cause of wrongdoing to request production of an angler's concealed catch. Since taking or possessing fish is not illegal per se, simply observing someone catching and keeping fish would not give rise to probable cause of a fish and game violation. Boyer's proposition would virtually require wardens or third parties to have personal knowledge of fish and game violations prior to conducting the contemplated inspection. Montana's vast geography, the anglers' somewhat uninhibited freedom of movement, and the remoteness from warrant issuing magistrates and law enforcement entities would severely impede game violation investigations. The inevitable result would be the unnecessary depletion of Montana's wildlife and fish which we are all bound to protect and preserve. We decline to impose this burden.

¶24 Our holding today should come as no surprise to outdoor enthusiasts. As alluded above, the Montana Fishing Regulations inform anglers of the requirement to produce their license and catch upon demand. To fish is a privilege accorded by the State, not a private right. Anglers are responsible for knowing the laws pertaining to their sport. See State v. Huebner (1992), 252 Mont. 184, 188, 827 P.2d 1260, 1263. In complying with the well established license requirements, anglers acknowledge the prospect of at least some governmental intrusion into their activities. In engaging in this highly regulated activity, anglers must assume the burdens of the sport as well as its benefits. Thus, no objectively reasonable expectation of privacy exists when a wildlife enforcement officer checks for hunting and fishing licenses in open season near game habitat, inquires about game taken, and requests to inspect game in the field. In this capacity, game wardens are acting not only as law enforcement officers, but as public trustees protecting and conserving Montana's wildlife and habitat for all of its citizens.

¶25 Finally, we consider the nature of the State's intrusion in conducting inspections without suspicion. A typical license or game inspection should require no more inquiry than: (1) Have you been fishing today?; (2) Do you have a valid Montana fishing license?; and (3) Do you have any fish in your

possession? In fact, Jones asked Boyer these very questions. The stops eliciting answers to these questions maintain close geographical and temporal ties to fishing activities. To the average law abiding angler, this line of questioning consumes little time and creates negligible anxiety, restriction of movement, and inconvenience. Legitimate anglers should experience minimal interference and the non-fishing segment of the population will proceed virtually uninhibited.

¶26 Boyer's claim that he had a legitimate expectation of privacy in his catch as he enjoyed the peace and tranquility of the Missouri River reeks of irony as his peaceful and tranquil poaching threatened the river's resources for future generations. For the foregoing reasons, we conclude that society is not willing to recognize an angler's subjective expectation of privacy in his or her catch as objectively reasonable. As such, we hold that Jones' request for and inspection of Boyer's catch was not a search. Therefore, the probable cause requirement contemplated in § 87-1-506(1)(b), MCA, does not apply.

## C. Stepping on Boyer's Boat

¶27 We now turn to the most important phase of our inquiry. We have already concluded that Jones lawfully approached Boyer's boat to conduct a welfare check. To conduct this check, Jones pulled his boat alongside Boyer's and held the two boats together with his hands. Jones then lawfully requested Boyer's fishing license. After Boyer admitted to fishing, Jones lawfully requested to see Boyer's catch. Boyer suggested a later time for the inspection and Jones declined this suggestion. Boyer then opened the live well and reluctantly removed eight fish. After removing these fish from the live well and leaving it open, Boyer again requested that Jones conduct the inspection at a later time. At this juncture Jones drifted to the downstream end of Boyer's boat and tethered the boats together. Jones then stepped onto the transom of Boyer's boat to inspect his catch.

¶28 Prior to tying the boats together, Jones merely requested production of Boyer's license and catch. Jones did not need a particularized suspicion to make such requests. In making the requests, Jones did not seize Boyer by restraining his freedom of movement. See State v. Reynolds (1995), 272 Mont. 46, 49, 899 P.2d 540, 542. However, Jones' subsequent act of tying the boats together did restrain Boyer's freedom of movement. Therefore, Jones initiated an investigative stop at the instant he tied the boats together.

¶29 To stop a person, an officer must have a particularized and objective basis for suspecting the particular person of criminal activity. State v. Farabee, 2000 MT 265, ¶ 14, 302 Mont. 29, ¶ 14, 22 P.3d 175, ¶ 14. In Farabee, we recognized that for the State to prove the existence of a particularized suspicion, the State must show: (1) objective data from which an experienced police officer can make certain inferences; and (2) a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing or was witness to criminal activity. Farabee, ¶ 14. The Montana Legislature has codified these principles in § 46-5-401, MCA. Farabee, ¶ 14. Whether a particularized suspicion exists to justify an investigative stop is a question of fact which is dependent on the totality of the circumstances. Farabee, ¶ 14.

¶30 At the suppression hearing, Jones testified that he had a reasonable suspicion that a fishing violation had occurred. Clearly, to Jones, Boyer's conduct created suspicion of wrongdoing. Jones testified that requesting production of a fishing license and catch on patrol was routine. He further testified that in his opinion licensed anglers are aware of the statutory requirement to present their catch upon request. Boyer's reluctance to present his catch did provide objective data upon which a warden could suspect

wrongdoing. We conclude that Boyer's actions support a determination of particularized suspicion justifying an investigative stop.

¶31 The dissent makes note that Jones testified at the hearing that he did not have probable cause at this juncture that a crime had been committed. Whether or not probable cause existed at this instant, however, is not relevant. Jones testified that he had a reasonable suspicion that an offense had occurred. It is the presence of reasonable suspicion that allowed Jones to proceed with the investigative stop.

¶32 After Jones initiated the investigative stop, Boyer claims that Jones performed an illegal search when he stepped onto the transom of Boyer's boat to inspect the live well. The State argues that Jones' actions did not constitute a search because Boyer did not have a reasonable expectation of privacy in the transom on his boat. Again, we consider the three privacy factors referenced above to determine whether Jones' act of stepping on the rear platform of Boyer's boat constituted a search.

¶33 Under these circumstances, we believe that the nature of Jones' intrusion was so minimal as not to violate any alleged privacy interest that Boyer may have had. As noted above, § 87-1-502(6), MCA, authorized Jones to inspect Boyer's catch. In attempting to inspect Boyer's catch, Jones merely placed a foot upon the transom of Boyer's boat–an exterior platform which was readily accessible to the public. In so doing, Jones did not disturb any personal property or gain access to any place not readily visible from a higher vantage point. Compare State v. Bullock (1995), 272 Mont. 361, 901 P.2d 61 and State v. Romain (1999), 295 Mont. 152, 983 P.2d 322 (holding that an officer's warrantless entry on private property which is fenced, gated, and posted with "No Trespassing" or similar signs constitutes an unlawful search).

¶34 We have recently held that a homeowner does not have an objectively reasonable expectation of privacy regarding the use of unposted and unobstructed property leading to the front door of a home, including the porch. State v. Hubbel (1997), 286 Mont. 200, 210, 951 P.2d 971, 977. The transom used by Jones is similar to a porch abutting a house, although certainly a home is more private and protected than a fishing boat on a public waterway.

¶35 We would also point out that the live well was open when Jones made his observations. A live well on a fishing boat would not typically contain anything other than river water and fish. Jones' actions were no more invasive than a game warden looking into the open canopy of a pickup, or a police officer observing contraband on the floor of an automobile in connection with an investigative stop. They were certainly no more invasive than a game warden stepping on a bumper of a pickup to inspect a tagged deer or elk.

¶36 We hold that Boyer had no legitimate expectation of privacy that society is willing to recognize as objectively reasonable in the rear platform on his boat. Consequently, Jones' act of stepping on the transom did not constitute a search. Therefore, contrary to the dissent's behest, we need not indulge in a lengthy discussion of whether Jones had probable cause to step on the transom.

¶37 Once Jones lawfully stepped on the transom, he could see into the open live well. This plain view observation revealed that Boyer possessed additional fish, in excess of his legal limit. Jones' observation allowed him to remove the excess fish from Boyer's live well and issue the unlawfully killed game fish citation. Therefore, the District Court did not err in denying Boyer's motion to suppress.

¶38 Attempting to equate this case to an automobile search, Boyer's argument is replete with references and analogies to State v. Elison, 2000 MT 323, 302 Mont. 228, 14 P.3d 456. In Elison, after initiating an investigatory stop, the officer requested that the defendant exit his vehicle. After the defendant admitted to stowing marijuana behind a seat, the officer opened the vehicle's door, tilted the driver's seat forward,

and discovered a film canister which he removed and opened. During the search, the officer also observed a paper bindle, a two-inch tube, and a razor blade on the seat and floor board. The defendant filed a motion to suppress the evidence which the district court denied. We concluded that an individual does not surrender a privacy interest in items which the individual takes precaution to conceal from public access simply because the items happen to be in an automobile. Elison, ¶ 51. Since none of the warrantless search exceptions applied to the officer's search, we reversed the district court's denial of Elison's motion to suppress.

¶39 The critical distinction between Elison and the case at bar is the second privacy factor of the three-prong test articulated above. We have defined "search" as the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy. Elison, ¶ 48. In Elison, we acknowledged that individuals have a reasonable expectation of privacy in the items stowed behind their automobile seats. Elison, ¶ 49. Here, we concluded that an individual does not have an objectively reasonable expectation of privacy in game fish since: he or she has a constitutional duty to maintain and improve a clean and healthful environment; the Legislature enacted § 87-1-502(6), MCA, charging anglers with the duty to produce fish in their possession for inspection; and the Montana Fishing Regulations notify anglers of this duty to produce their fish. Therefore, the request for and inspection of an angler's catch does not constitute a search.

¶40 We further concluded that individuals have no objectively reasonable expectation of privacy in the transom on their boat. It is with this conclusion that the dissent takes us to task and cites a laundry-list of cases for the proposition that boats on public waterways enjoy the same search and seizure protections as automobiles on public highways. Accordingly, Justice Nelson concludes that "individuals boating on Montana's public waterways have a reasonable expectation of privacy in their boats and in items stowed therein beyond the purview of the public." Thus, the dissent emphatically suggests that we have failed to address Boyer's legitimate and reasonable expectation of privacy in his boat and its contents.

¶41 We disagree. Here, in an effort to inspect Boyer's catch, Jones did nothing more than step onto the transom of Boyer's boat. Boyer argues on appeal that this action constituted an unlawful search. The dissent echoes the same argument. Our fundamental disagreement with both Boyer and the dissent focuses on Jones' decision to step on the transom of the boat. We simply believe that Boyer did not have a legitimate expectation of privacy in the transom on his boat that society is willing to recognize as objectively reasonable. As previously stated, what occurred here was no different than a game warden stepping on the bumper or running board of a pickup to get a better view of a tagged animal. We suspect this occurs on numerous occasions throughout hunting season in Montana without hunters thinking that their rights of privacy have been invaded.

¶42 Since Boyer did not have a privacy interest in the transom on his boat, a search never occurred. Once Jones lawfully occupied the transom on Boyer's boat, he could see the live well's contents in plain view. Jones did not conduct a search of the boat, look under the seats, remove or rearrange any personal belongings, or even open the top of the live well. By comparison, the actions of the officer in Elison were far more invasive. There, the officer actually opened the door of the vehicle and conducted a search of the interior. The search included tilting the driver's seat forward to inspect for contraband. In doing so, the officer found a film canister which he then opened and discovered marijuana. The search proceeded and the officer found a paper bindle located next to the film canister as well as a two-inch tube on the seat and a razor blade on the floor board.

¶43 In our view the facts presented in Elison are clearly and quite properly distinguishable. Boyer's right

to privacy was not violated and the District Court was correct in denying his motion to suppress.

¶44 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM RICE

Justice W. William Leaphart specially concurring.

¶45 I specially concur. As the Court states, fishing is not a right, it is a privilege granted by state license. The law, § 87-1-502(6), MCA, requires, and Boyer was on notice that upon request, he had to " . . . exhibit the same [any fish] and all thereof to the warden for such inspection." Had he asserted his right of privacy, denied the warden's request and refused to open the well, the warden would have been confronted with a "search" situation. Boyer, however, chose to open the well. Once Boyer chose to honor the warden's request to exhibit his catch by first admitting that he had fish in the well and then voluntarily opening the live well, he had no more reasonable expectation of privacy in the contents of the well; he was no longer seeking to preserve the contents as private. See, Katz v. United States (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582. Section 87-1-502(6), MCA, which has not been challenged, does not give the fisherman the option of showing "some" or "part" of his catch. Rather, it requires that he exhibit "all" fish in his possession. In the absence of a reasonable expectation of privacy, the warden's observation was not a "search."

¶46 The dissent posits that if a warden, without any probable cause, looks into a boat or live well, that constitutes a warrantless search. The dissent makes much ado about the fact that Jones, from his sitting position in his boat, could not see into Boyer's live well. Is the "plain view" doctrine so rigid that Warden Jones must remain seated; that he not look left or right or behind? If Warden Jones, instead of standing on the transom of Boyer's boat, stood on the transom or seat of his own boat and observed the contents of the open well, would we hold that that was a "search" for which there was no probable cause? I, for one, would not. The warden was merely observing that which had been knowingly exposed to the public; that which was in "plain view."

¶47 If we in effect legally blindfold wardens so that they cannot look into an open live well or the bed of a pick-up truck at a game check point, we will have created a poacher's haven where Montana's treasured wildlife will eventually go the way of the ill-fated dodo bird.

/S/ W. WILLIAM LEAPHART

Chief Justice Karla M. Gray joins in the specially concurring opinion of Justice Leaphart.

/S/ KARLA M. GRAY

Justice James C. Nelson dissents and concurs.

# I. Introduction

¶48 I concur in portions of the majority opinion, as noted below. However, I dissent from the ultimate decision of the Court. Constitutional issues aside, this case can, and should, be decided by applying the three plain and unambiguous statutes that pertain to this case--§ 87-2-109, MCA, § 87-1-502(6), MCA, and § 87-1-506(1)(b), MCA. The majority has given effect to the former two statutes, but has completely ignored the latter statute in order to reach a result that grants game wardens[1] broad authority to inspect catches in the field and purportedly protect wild fish and game as an environmental resource. While this resolution may be politically palatable, it is legally incorrect. The search at issue--and there was one, the trial court's and this Court's conclusions to the contrary notwithstanding--was unlawful under § 87-1-506 (1)(b), MCA, and should have been suppressed.

¶49 I will first set out those portions of the Court's opinion in which I concur and then turn to my disagreement with our decision. Finally, since the majority opinion raises several constitutional issues, I will, of necessity, also address those.

# II. Discussion

A. Concurrence:

¶50 I agree with the result of the Court's decision as articulated under "A. Jones' Initial Advance on Boyer's Boat." Clearly, on the facts here, Jones initially approached Boyer's boat, not because he believed that the presumed occupant had committed, was committing or was about to commit a criminal offense (see § 46-5-401, MCA), but, rather, to inquire into the safety and welfare of the presumed occupant (who turned out to be Boyer). As noted, we have held that peace officers are privileged to make these sorts of noncriminal, investigatory "welfare checks." See Grinde v. State (1991), 249 Mont. 77, 81, 813 P.2d 473, 476, overruled on other grounds by Bush v. Montana DOJ, 1998 MT 270, 291 Mont. 359, 968 P.2d 716.

[1] It is uncontroverted that Game Warden Jones is a "peace officer" authorized to investigate Title 87, MCA, offenses and to search, seize and arrest in conjunction therewith. Sections 87-1-502(7)(a) & (b), MCA, and § 87-I-506, MCA. See also §§ l-1-207(2) and 46-l-202(17), MCA.

¶51 I also agree that once Jones's "welfare check" was completed, he had the right, without need of any predicate particularized suspicion, to request to see Boyer's fishing license and catch. As stated by the

majority, § 87-2-109, MCA, requires a fisher to carry his license and to exhibit it on request of a game warden. Moreover, § 87-1-502(6), MCA, provides, in pertinent part:

> A warden has the authority to inspect any and all fish . . . at reasonable times and at any location other than a residence or dwelling. Upon request therefore, all persons having in their possession any fish . . . shall exhibit the same and all thereof to the warden for inspection.

Under this statute, Boyer was obligated to produce his catch on Jones's request and Boyer could have been charged with a misdemeanor if he refused. See Title 87, Chapter 1, Part 1, generally and, in particular, § 87-1-102, MCA, and § 87-1-506(1)(f), MCA.

¶52 Turning to the record before us, it is clear that Boyer was cooperative with Jones. Boyer freely admitted he had been fishing; he produced his fishing license when requested to do so; and he stated that he had fish in his possession which were in the closed live well in his boat. When asked to produce the fish, Boyer equivocated, but finally opened the live well and removed a legal number of fish.

¶53 Again, the record demonstrates that, from his position in his boat, Jones could not see into Boyer's live well. At this stage of the scenario, because of Boyer's hesitancy, Jones suspected that Boyer had too many fish in his possession. Notwithstanding, Jones conceded that he had no probable cause to believe that Boyer was in violation of the law limiting his possession of certain species of fish. And, this concession is important because it establishes that, on the record here, Jones had no legal authority to tie onto or to board Boyer's boat and to then engage in what was a warrantless search of the boat and the live well located within it. It is here, and for this reason, that I part company with the Court.

B. Dissent:

1. Boyer's Reasonable Expectation of Privacy in His Boat and in the Live Well

¶54 In that part of the Court's opinion captioned "2. The Request to Produce Boyer's Catch," the majority states at ¶ 18 that "[t]he precise inquiry, then, is whether Boyer is entitled to a reasonable expectation of privacy in the game fish he possessed."[2] The Court then launches into an extended discussion of constitutional privacy, the constitutional obligation to maintain a clean and healthful environment and constitutional principles of search and seizure law--all to the end that "our wild places and the creatures that inhabit them are preserved for future generations." Far be it from me to denigrate the importance of any of these general legal principles and these environmental and social imperatives. Indeed, I support them wholeheartedly.

> [2] The majority similarly frame the issue in this fashion at ¶39. Even the trial court did not see the privacy issue as involving the fish. Rather the District Court held there was no search because Boyer had no privacy

interest in his boat on a public
waterway. See ¶6.

¶55 The problem here, however, is that the "precise inquiry" is not whether Boyer had a reasonable expectation of privacy in his fish, but, rather, whether he had a reasonable expectation of privacy in his boat and in his live well. While I agree that Jones could request to see Boyer's license and catch without predicate particularized suspicion, there is a critical distinction between inspecting the catch and inspecting a container that holds the catch--which is, itself, within the confines of the boat. Indeed, the majority's seemingly innocuous re-statement of the issue from that actually decided by the trial court enables it to then ignore the record and reach the result sought. Importantly, when the "precise inquiry" is, properly framed--i.e. whether Boyer had a privacy interest in his boat and his live well--the majority's analysis falls apart. To that part of the Court's opinion I now turn.

¶56 While directly on point, the Court dismisses our decision in State v. Elison, 2000 MT 288, 302 Mont. 228, 14 P.3d 456, on the basis that Boyer had no expectation of privacy in his catch. See ¶ 39. However, as noted, the majority's focus on the fish is too narrow. The real focus of Elison is on the boat.

¶57 Elison explains at some length that Montana's Constitution, Article II, Sections 10 and 11, confers greater privacy protection than does federal law from warrantless searches of automobiles. Elison, in fact, rejects federal jurisprudence that allows such searches under the Fourth Amendment to the United States Constitution. Elison, ¶¶ 39-51. Elison states that this Court has reaffirmed that "the word 'automobile' is not a talisman in whose presence the . . . [warrant requirement] fades away and disappears." Elison, ¶ 47 (citing State v. Sawyer (1977), 174 Mont. 512, 517, 571 P.2d 1131, 1133). Because an individual has a reasonable privacy interest in areas where items can be stowed out of sight in his automobile; because warrantless searches of automobiles invades this legitimate interest; and even assuming compelling state interests may be implicated, "the State may not invade an individual's privacy unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met." Elison, ¶ 53 (citing Hulse v. Department of Justice, 1998 MT 108, ¶ 34, 289 Mont. 1, ¶ 34, 961 P.2d 75, ¶ 34). In making this point, we stated unequivocally:

> Because of the legitimate privacy interests implicated and the invasive and generally overbroad nature of the state's intrusion on these interests, the search of an automobile requires more than merely the existence of probable cause to believe it contains evidence of a crime. On the foregoing basis, we conclude that, despite any language to the contrary in our previous decisions, there is no "automobile exception" to the search warrant requirement under the Montana Constitution. Rather, as we have consistently held, a warrantless search of an automobile requires the existence of probable cause as well as a generally applicable exception to the warrant requirement such as a plain view search, a search incident to arrest, or exigent circumstances.

Elison, ¶ 54 (emphasis added).

¶58 This statement of law, of course, begs the question: "Is a boat the equivalent of an automobile for purposes of search and seizure?" Montana has not addressed this question directly, but the case law from other jurisdictions provides an affirmative answer. For purposes of search and seizure, boats on public waterways and automobiles on public highways are not subject to different legal principles. See Carroll

v. United States (1925), 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (distinguishing between stationary structures and movable vehicles for Fourth Amendment warrant purposes); United States v. Lauchli (7th Cir. 1984), 724 F.2d 1279, 1282 (officer had probable cause and exigent circumstances to search boat without a warrant); United States v. Whitaker (5th Cir. 1979), 592 F.2d 826, 829-30 (automobile exception applies to boats; areas of a boat might have heightened expectations of privacy); United States v. Weinrich (5th Cir. 1978), 586 F.2d 481, 494; Blair v. United States (4th Cir. 1981), 665 F.2d 500, 505 (Fourth Amendment analysis applies to searches of boats); Prochaska v. Marcoux (10th Cir. 1980), 632 F.2d 848, 852 (no Fourth Amendment violation because officer did not board the boat); United States v. Raub (9th Cir. 1980), 637 F.2d 1205, 1208 (warrantless boarding of boat falls within Fourth Amendment); State v. Sullivan (Mo. Ct. App. 1996), 935 S.W.2d 747; Taylor v. State (Fla. Dist. Ct. App. 1978), 355 So.2d 180 (authority to stop boat does not include authority to conduct general search of the boat).

¶59 Thus, boats on public waterways and automobiles on public highways, being equivalent moveable objects or "vehicles" for purposes of applying search and seizure jurisprudence, it follows that under Elison, individuals boating on Montana's public waterways have a reasonable expectation of privacy in their boats and in items stowed therein beyond the purview of the public. This privacy interest is subject to greater protection than that afforded under federal law. And, even assuming a compelling state interest (such as apprehending fishers who catch too many fish), "the State may not invade [this privacy interest] unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met." Boats have no more "talismanic" significance when it comes to the guarantees against unreasonable searches and seizures under Article II, Sections 10 and 11 (and under the Fourth Amendment) than do automobiles. Elison requires that to search a boat, the peace officer must have a warrant or if the search is warrantless, then he must have probable cause coupled with a generally applicable exception to the warrant requirement. Elison, ¶¶ 47, 53, 54. While the majority asserts that the search in Elison was more invasive, in fact, the searches are fundamentally similar. In both cases the law enforcement officer invaded the reasonable and legitimate privacy interest of the defendant in his vehicle/boat for the purpose of searching for and seizing evidence of criminal conduct, and the officer did so without a warrant and without demonstrating a generally applicable exception to the warrant requirement.

¶60 Of necessity, that brings us to the part of the majority opinion captioned "C. Stepping on Boyer's Boat."

¶61 A forthright appraisal of the record in this case clearly demonstrates that the only reason Jones tied onto Boyer's boat was so that he could board the boat and look into the live well that he could not see into from his own boat and which he suspected contained more fish than those displayed by Boyer. The State's brief candidly asserts that "[b]ecause Boyer [sic] was unable to see into the live well from his boat, he [Jones] tied onto Boyer's boat and stepped onto the exterior platform attached to the transom of Boyer's boat."

¶62 Moreover, the transcript of Jones's answers to questions at the District Court suppression hearing dictates this conclusion:

Q. Then what did he do after the eighth fish?

A. He laid the eighth fish out, and then I wasn't able to see or -- the balance or whatever

was still in the live well, so I drifted back, tied my boat off to his -- to his, and stepped out on his -- it's actually a platform off the rear of his boat.

Q. Yes, and then did you look in the live well yourself?

A. Yes.

. . .

Q. And you stepped onto his boat for what purpose again?

A. To count the remainder of the fish and take a look at the remainder of the fish he had in his live well.

Q. Could you see the fish from your position in the boat before you moved?

A. No.

Q. Why couldn't you see it:

A. Well I just wasn't up at a point -- you know, in order to see you have to pretty much be above the live well.

. . .

Q. When you stepped onto this platform on the back of his boat, your purpose was to look into the live well and to examine the fish he had remaining; is that right?

A. Right.

. . .

Q. If you hadn't seen the remaining fish in the live well, and all you saw was the eight laying on the deck, did you have -- do you think you had probable cause at that point to search the live well?

A. Well I'm trying to remember whether or not he indicated that there were, you know, definitely more fish in there, and I don't remember the conversation whether he did or he didn't. So you're asking if I had known there was additional fish in there?

. . .

A. Well I don't think I did when he laid out the eight and said, can we do this later, and, you know, once we conversed about it and talked, you know he agreed to, you know, let me look in the live well[3].

Q. [The defense attorney] asked you several questions several times about particularized suspicion and probable cause, and at several instances through out this encounter with the defendant, and based upon your testimony, what you're telling the court is you didn't have any probable cause to stop and search his boat until you actually saw he had excess fish; it that right?

A. That's correct.

¶63 Again, it is important to recognize that, at the point of his tying onto Boyer's boat, Jones conceded that he had no probable cause to believe that Boyer had done anything unlawful. The record unequivocally demonstrates that Jones boarded Boyer's boat--i.e., that he invaded a space in which Boyer had a constitutionally protected privacy interest--without a warrant; without probable cause; and for the sole purposes of inspecting a container within the boat (that he otherwise could not see into without boarding the boat) to gather evidence of what he suspected was a criminal act.

[3] The District Court concluded, and neither party disagrees, that Boyer did not consent to a search of his boat or the live well.

¶64 The Court justifies this warrantless invasion in three ways. First the majority categorize Jones's seizure as an "investigatory stop." Second, the Court likens the platform on the transom of Boyer's boat to a porch abutting a house. And, third, the majority concludes that, once legally on the transom platform, Jones could see into the open live well with the result that the illegal fish were in "plain view." If ever there was an example of hoisting oneself to the top of a house of cards by one's own bootstraps, this part of the majority opinion fits the bill precisely. In disposing of this analysis, I will address the "plain view" contention first.
¶65 It is clear that if Jones was not legally on Boyer's boat in the first place--and he was not--then the plain view doctrine cannot justify the officer's observation and seizure of evidence of criminal conduct that was located in a container within the boat and into which Jones could not see except by boarding the boat. In State v. Loh (1996), 275 Mont. 460, 914 P.2d 592, we made clear this point of law:

The essential predicate to any valid warrantless seizure of incriminating evidence [under the plain view doctrine] is that the officer must be lawfully at the place from which he could plainly view the evidence. In other words, his initial entry onto or intrusion into the place where he views the evidence must not have been in violation of the Fourth Amendment or in violation of Article II, Section 11 of Montana's Constitution.

Loh, 275 Mont. at 473, 914 P.2d at 600. Further, unlike the majority's analogy to an officer stepping onto a running board or bumper of a pickup to get a better look at a kill in back or otherwise in plain view, Jones, according to his testimony, did not know there were any fish in the live well until he

looked. In the case at bar, there were no illegal fish in "plain view" until Jones boarded the boat and thereby invaded Boyer's constitutional zone of privacy.

¶66 Next, turning to the majority's "investigatory stop" and "platform-on-the-transom-is-a-porch analysis," this entire discussion is nothing more than a red-herring (or, perhaps, more accurately, a red-walleye) designed to provide a convenient, albeit legally disingenuous, vehicle to get Jones from his boat (where he could not see into the live well) onto Boyer's craft where he could then observe the incriminating evidence in "plain view." This mental legerdemain is akin to the majority placing the "privacy" focus on the fish, rather than on Boyer's boat, where, as already noted, it properly belongs. This ruse cannot be sustained on the record before us, however.

¶67 As has been already aptly demonstrated, Jones boarded Boyer's boat for one and only one purpose-- to look into the live well so as to confirm his belief that Boyer was in possession of more fish than he was allowed under the law. This activity constituted a constitutional search in the purest sense.

¶68 It is well established that the Fourth Amendment protects people, not places, and that what a person seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. Katz v. United States (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582; State v. Bullock (1995), 272 Mont. 361, 375, 901 P.2d 61, 70. Accordingly, when the police invade an area in which a person has an actual expectation of privacy that society is willing to recognize as reasonable, then, in the constitutional sense, a "search" has occurred. See Bullock, 272 Mont. at 384, 901 P.2d at 75-76; Elison, ¶ 48.

¶69 Fundamentally, a "search," in the constitutional sense, is simply a quest by an officer of the law with an intention to find, which invades a constitutionally protected area. State v. Williams (1969), 153 Mont. 262, 269, 455 P.2d 634, 638. It is "some means of gathering evidence which infringes upon a person's reasonable expectation of privacy." Elison, ¶ 48 (citing Hulse, ¶ 22).

¶70 Moreover, as already noted, because of Montana's unique protection of the right of individual privacy afforded by Article II, Section 10, this Court has consistently held that Montanans enjoy broader protection in search and seizure cases under Article II, Section 11, than is provided under the Fourth Amendment. Bullock, 272 Mont. at 384, 901 P.2d at 75; State v. Siegal (1997), 281 Mont. 250, 263, 934 P.2d 176, 183; Elison, ¶¶ 45-47.

¶71 On the record here, Jones did not tie onto and board Boyer's boat to "investigate." Rather he agreed, unequivocally, that he boarded the boat to: "look into the live well and to examine the fish [Boyer] had remaining." And, he conceded that he did so without probable cause to conduct this search.

¶72 As to the "platform-on-the-transom-is-a-porch" part of the majority opinion, the Court cites no authority (and I have found none) for the proposition that a platform on the transom of a boat is anything but what common sense dictates it actually is--part of the boat. The analogy to the platform on the transom being a porch does not comport even remotely with commonly accepted definitions of these words.

¶73 Specifically, Merriam Webster's Collegiate Dictionary 1255 (10th ed. 1997) (hereinafter Webster), defines a "transom" (as it relates to a boat) as "any of several transverse timbers or beams secured to the sternpost of a boat." A "platform," as pertains here, is defined as a "raised horizontal flat surface." Webster, at 891. And a "porch" is defined as a "covered area adjoining an entrance to a building and usu. having a separate roof." Webster, at 906.

¶74 Was the platform on the transom of Boyer's boat a "covered area adjoining an entrance to a building . . . [with] . . . a separate roof?" Not according to the record here.

¶75 Furthermore, the platform on the transom of a boat is no more "public" or less entitled to constitutional protection than any other part of the boat. The majority opinion begs the question: if the boat had not had a platform on the transom, could the game warden have stepped on the out-drive in order to climb onto the boat since that was sticking out from the stern of the boat and was "readily accessible to the public?" If there were no platform on the transom, could Jones have simply climbed over the stern or over the side of Boyer's boat, and would that have turned what the majority concludes is a legal search into an illegal one? What if the top of the stern was low to the water versus high to the water? Would the game warden be legally entitled to climb over the former, but not the latter? What if there was a ladder attached to the stern of the boat? Would a ladder also be classified as a "porch" for search and seizure purposes? The absurdity of the majority's analogy is apparent.

¶76 In short, the Court's "platform-on-the-transom-is-a-porch" analogy is, as Abraham Lincoln is reported to have observed, "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death." See Beamsley v. Commissioner of Internal Revenue (7th Cir. 1953), 205 F.2d 743, 748. Indeed, it will no doubt come as a shock to Montana boat owners to learn that a device which makes boarding the boat more convenient for those legally entitled or invited, has now been transformed by this Court into a public access. Boat owners might now be well-advised to post "no trespassing" signs on their vessels to protect their privacy interests.

¶77 In summary, as a matter of law, Boyer had the same privacy interest in his boat and in that which was stowed in a place where it could not be seen from outside the boat, as he would have had in his automobile and in items stowed away from the purview of the public in his automobile. Elison dictates this conclusion.

¶78 Here we have Jones, a peace officer, entering onto Boyer's boat--in which Boyer had a reasonable privacy interest--specifically to look for evidence of suspected criminal conduct that could not be observed without boarding the boat. Viewed in this light--which is the only context that the record actually supports--we are confronted with a classic search in the constitutional sense. And, that brings us to § 87-1-506(1)(b), MCA.

2. Section 87-1-506(1)(b), MCA, Applies to Jones's Search of Boyer's Boat.

¶79 Presumably seeking to balance fishers' Article II, Sections 10 and 11 guarantees against unreasonable searches and seizures and its desire "[t]o safeguard Montana's wildlife for present and future generations," the Legislature enacted § 87-1-506(1)(b), MCA. The majority pays no attention to this statute. Indeed, the majority, inexplicably, concludes that this statute does not apply to the facts in this cause at any stage, including when Jones stepped onto Boyer's boat. See ¶¶ 17, 18, 26.

¶80 Rather, the majority hangs its hat on its constitutional, "investigatory stop," and "platform-on-the-transom-is-a-porch" analyses. Understandably the majority takes this approach, because if it applied § 87-1-506(1)(b), MCA, it would have to conclude, as I do, that Jones's search violated the statute and was, therefore, unlawful. Unfortunately, in ignoring § 87-1-506(1)(b)--the statute directly applicable to the case at bar--the Court errs.

¶81 Section 87-1-506(1)(b), MCA, provides that a warden may:

search, without a warrant, any tent not used as a residence, any boat, vehicle, box, locker, basket, creel, crate, game bag, or package, or their contents upon probable cause to believe that any fish and game law or department rule for the protection, conservation, or propagation of game, fish, birds, or fur-bearing animals has been violated. (emphasis

added)

Under this statute, any "search" of the property listed must be based upon probable cause.

¶82 Did Jones have probable cause when he boarded Boyer's boat to conduct his search for the suspected over-limit fish? On the record, Jones conceded that he did not. Rather, according to the record Jones stated that he had "some suspicion."

¶83 Assuming, arguendo, that "some suspicion" rises to the level of "particularized suspicion"--and it does not even under the majority's authority cited at ¶ 29 of the opinion--it is legally uncontrovertible that "particularized suspicion," (or the analogous terms "reasonable suspicion" and "reasonable grounds") is not the equivalent of "probable cause." Particularized suspicion represents a quantum of belief, understanding or knowledge weaker than probable cause. See Deserly v. Department of Corrections, 2000 MT 42, ¶¶ 25, 30, 298 Mont. 328, ¶¶ 25, 30, 995 P.2d 972, ¶¶ 25, 30.

¶84 Accordingly, under the plain and unambiguous language of § 87-1-506(1)(b), MCA, Jones's search was unlawful. Jones had no probable cause to board Boyer's boat or to search the live well.[4] We need go no further in order to hold that the trial court's failure to suppress was error as a matter of law. Jones's search violated § 87-2-506(1)(b), MCA, and I would reverse on this basis without more.

### 3. Constitutional Issues

¶85 That said, there are two other facets of the majority opinion that must be addressed. These two issues are integrally bound up in the majority's analysis, in its re-framing of the "precise issue" to focus on Boyer's catch, and in its failure to address and apply § 87-1-506(1)(b), MCA.

¶86 First, by failing to apply § 87-2-506(1)(b), MCA, the Court conveniently avoids the need to address Elison's requirement that a warrantless search of a vehicle be justified by probable cause coupled with a generally applicable exception to the warrant requirement. Obviously, § 87-2-506(1)(b), MCA, includes only half the requirements for a constitutionally valid warrantless search--the probable cause half. Section 87-2-506(1)(b), MCA, contains no requirement for the warrantless search to be also supported by a generally applicable exception to the warrant requirement--the second half of the Elison mandate.

[4] Because the majority did not analyze § 87-l-506( l)(b), MCA, in detail, there is no discussion regarding whether a live well falls within the list of possible containers that can be searched under § 87-l-506( l)(b), MCA. While the list does not specify live wells, per se, such a container serves a similar function as a locker or, perhaps, a creel or a game bag. More

importantly, the live well here, as I understand it, was physically part of the boat--and boats are referred to in the statute. Moreover, neither party has argued that a live well should be excluded from the statute since it is not specifically listed. Accordingly, for purposes of this opinion, at least, I assume that a live well is within the protection of the statutory requirements

¶87 Arguably, this is not a problem in the case at bar, because, as discussed above, the record is clear that Jones did not even have probable cause to search Boyer's boat. Whether Jones could or could not demonstrate a generally applicable exception to the warrant requirement is, thus, largely irrelevant. Without more, we could, and should, simply apply § 87-1-506(1)(b), MCA, and hold that Jones's search was invalid.

¶88 That said, I will concede, however, that the majority's approach of simply ignoring § 87-1-506(1)(b), MCA, avoids the more serious issue--i.e., whether the Legislature can, under Montana's Constitution, statutorily authorize a warrantless search based merely on probable cause. As to that, I conclude it is beyond the power of the Legislature to do so. Indeed, in my view, § 87-1-506(1)(b), MCA, is facially unconstitutional.

¶89
In enacting this statute the Legislature has: (a) eliminated the Constitution's warrant requirement and (b) also disposed of the requirement that warrantless searches be supported by both probable cause and a judicially-recognized exception to the warrant requirement. I vehemently disagree that a law can be enacted to accomplish this result.

¶90 In interpreting both the United States Constitution and Montana's Constitution, we have frequently reaffirmed a time-worn dogma that is gospel to every first-year law student: warrantless searches and seizures are per se unreasonable subject to only a few carefully drawn exceptions. Katz, 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585; Loh, 275 Mont. at 468, 914 P.2d at 57; Elison, ¶ 39.

¶91 These exceptions are, fortunately, few and have been developed over decades by the courts. In Montana (and concomitantly under federal jurisprudence, although the federal counter-part cases are not cited) these exceptions include: a search incident to a lawful arrest, State v. Graham (1995), 271 Mont. 510, 512, 898 P.2d 1206, 1208; evidence in plain view, (though listed as an "exception" there really is no constitutional search or seizure where the doctrine applies), Loh, 275 Mont. at 468, 914 P.2d at 597; evidence discovered from a protective frisk during a stop based on reasonable suspicion, State v. Dawson (1999), 295 Mont. 212, 219, 983 P.2d 916, 921; evidence discovered during hot pursuit, State v. Dow (1992), 256 Mont. 126, 132, 844 P.2d 780, 784; and exigent circumstances that show evidence will disappear if not seized without a warrant, State v. Wakeford, 1998 MT 16, ¶ 24-32, 287 Mont. 220, ¶ 24-32, 953 P.2d 1065, ¶ 24-32. Federal jurisprudence also allows for an "automobile exception"--see

Carroll, 267 U.S. at 153, 45 S.Ct. at 285, 69 L.Ed. 543 and its progeny--but, as already noted, Montana has done away with this exception to the warrant requirement by reason of the greater protections afforded under Article II, Sections 10 and 11.

¶92 Each of these "carefully drawn" exceptions typically involves circumstances where the accused's privacy rights are not unreasonably infringed by the search and, more importantly, each exception is, at its heart, grounded in the exigent circumstances inherent in the particular situation.

¶93 In the case at bar, where fish and game are involved, the Legislature has, by statute, selectively authorized a class of searches that, at one and the same time, violates the Constitution and creates a class of peace officers that do not have to follow the search and seizure strictures that bind other law enforcement officers. The plain language of § 87-1-506(1)(b), MCA, summarily does away with the warrant requirement of the Fourth Amendment and Article II, Section 11, and, additionally, authorizes these warrantless searches to be based merely on probable cause and without a generally applicable exception to the warrant requirement of the Constitution.

¶94 If the Legislature can do this in fish and game cases, then, it follows I suppose, that all sorts of other exceptions to the warrant requirement can be created simply by legislative fiat. Why not statutorily authorize automobile searches based merely on probable cause? Elison should not stand in the way if the Legislature chooses to delete the "generally applicable exception" requirement which this Court imposed for warrantless searches in such cases. Why not statutorily authorize seizure of a person's medical records based simply on probable cause? Who needs a warrant if the Legislature decides otherwise? I cannot agree that the Legislature has this power.

¶95 It is a fundamental--and, perhaps the most fundamental--principle of constitutional law that a legislative body cannot abrogate constitutional rights by the simple expedient of enacting a law or statute. Marbury v. Madison (1803), 5 U.S. 137, 176-78, 2 L.Ed. 60 (the United States Constitution is "the basis on which the whole American fabric has been erected" and is "superior to any ordinary act of the [L]egislature"); State ex rel. Bennett v. Bonner (1950), 123 Mont. 414, 435, 214 P.2d 747, 758 ("Whenever the will of the [L]egislature, declared in its statutes, stands in opposition to the will of the people, declared in the [C]onstitution, the judges ought to be governed by the [C]onstitution rather than by the statutes"); Hurtado v. California (1884), 110 U.S. 516, 535, 4 S.Ct. 111, 120, 28 L.Ed. 232 ("Due process of law . . . refers to that law of the land which derives its authority from the legislative powers conferred upon [C]ongress by the [C]onstitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law."); Northwestern Mut. Life Ins. Co. v. Lewis & Clarke County (1903), 28 Mont. 484, 496-97, 72 P. 982, 984-6 (Constitution is the fundamental law).

¶96 As noted above, warrantless searches are per se unreasonable and, to be otherwise justified, must be based on probable cause and a carefully drawn exception. Katz, 389 U.S. at 357, 88 S.Ct. at 514, 19 L. Ed.2d at 585; Elison, ¶ 54. One without the other is patently unconstitutional. And, § 87-1-506(1)(b), MCA, which authorizes warrantless searches based merely on probable cause is precisely that-- unconstitutional on its face.

¶97 That is not to say that the Legislature might not craft a statute that is in accord with the requirements of Article II, Sections 10 and 11, as this Court has interpreted those.[5]Indeed, I recognize that exigent circumstances, an established and carefully-drawn exception to the warrant requirement, may be present when a game warden is in the field. However, exigent circumstances are not textually required by § 87-1-506(1)(b), MCA. Rather, the statute simply disposes, wholesale, of (a) the warrant requirement and (b)

the "generally applicable exception" prong of the two-prong requirement for warrantless searches when it comes to the vast majority of fish and game search cases. And that is a fatal and facial flaw in the statute. See Berger v. New York (1967), 388 U.S. 41, 58-60, 87 S.Ct. 1873, 1883-84, 18 L.Ed.2d 1040 (striking down state statute that was too broad in its sweep and therefore violated Fourth Amendment protections).

> 5 For example, see § 46-6-3 I 1, MCA, which reads: "(I) A peace officer may arrest a person when a warrant has not been issued if the officer has probable cause to believe that the person is committing an offense or that the person has committed an offense and existing circumstances require immediate arrest. (2) (a) The summoning of a peace officer to place of residence by a partner or family member constitutes an exigent circumstance for making an arrest."

¶98 In Elison, we departed from federal law and held that Montana has no general "automobile exception" to the warrant requirement because our state constitution affords greater privacy rights than the federal constitution. Elison, ¶ 46-51. We held that specific exigent circumstances must be shown because exigency is not automatically inherent in the fact that evidence is in a vehicle. The standard in fish and game search cases should be no less. Indeed, it cannot be. To paraphrase, "the word 'boat' is not a talisman in whose presence the . . . [warrant requirement] fades away and disappears." Elison, ¶ 47.

¶99 Finally, I must address the majority's reliance on Article IX, Section 1(1), the clean and healthful environment provision of Montana's Constitution. Again, I have no problem with the premise argued vigorously by the State, and adopted by the majority, that this provision of Montana's Constitution protects Montana's wildlife for present and future generations. Indeed, I can only hope that the State remembers well this argument and just as vigorously enforces this constitutional imperative the next time some individual or business poisons Montana's ground, water and air with toxic wastes and pollutants and when laws and administrative rules are enacted which weaken the protections afforded by this part of our Constitution and which allow degradation of its precious natural resources.

¶100 Nor do I reject the notion that the Constitutional guarantee of a clean and healthful environment may be implicated in search and seizure cases. In fact, in Armstrong v. State, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, we observed that Montana's Constitution was drafted as a compact of overlapping and redundant rights and guarantees. Armstrong, ¶ 71.

¶101 Nonetheless, no constitutional guarantee is absolute. See Bozeman Daily Chronicle v. City of Bozeman Police Dept. (1993), 260 Mont. 218, 224, 859 P.2d 435, 439 (balancing constitutional right of

public to know with individual's constitutional right to privacy). Competing constitutional rights must sometimes, of necessity, be balanced one against the other. At least under the facts presented in the case at bar, where the fundamental rights of individual privacy and freedom from unreasonable searches and seizures must be balanced against the right to a clean and healthful environment, I would hold that the latter may not trump the former. Individual privacy is simply too precious and fragile a constitutional right to be sacrificed on the altar of cases such as the one at issue here.

¶102 In reaching this conclusion, however, I reiterate the view expressed in my concurrence in Associated Press Inc. v. Montana Dept. of Revenue, 2000 MT 160, 300 Mont. 233, 4 P.3d 5, that the right of privacy protected under Article II, Section 10 is guaranteed to individuals--i.e. human beings-- only and is not a right enjoyed by non-human entities. Associated Press, ¶¶ 45-131 (J. Nelson, concurring). Indeed, since business organizations do not enjoy the full plethora of Fourth Amendment rights--see, G.M. Leasing Corp. v. United States (1977), 429 U.S. 338, 353, 97 S.Ct. 619, 629, 50 L.Ed. 2d 530 (a business by its special nature and voluntary existence may open itself to intrusions that would not be permissible in a purely private context)--in the balancing calculus, constitutional environmental guarantees may carry the greater weight and may, thus, allow searches and seizures of the property and effects of non-human entities that might not pass muster if individuals were involved.

## Conclusion

¶103 Based on the plain language of § 87-1-506(1)(b), MCA, I would hold that Jones's search of Boyer's boat was unlawful since the search was not based upon probable cause. Accordingly, I would reverse the District Court's denial of Boyer's motion to suppress. I disagree with our decision not to reach that result.
¶104 Except to the extent to which I concur as indicated above, I dissent.

/S/ JAMES C. NELSON
Justice Terry N. Trieweiler dissents.

¶105 I concur with all of Justice Nelson's dissent except ¶¶ 52-54 which discuss balancing the constitutional right of privacy with the constitutional right to a clean and healthful environment.
¶106 I do not believe that the right to a clean and healthful environment was implicated by the record in this case. Neither was it raised as an issue raised in the District Court. Nor did it serve as any basis for the District Court's opinion. Finally, I doubt that I would achieve the same balance if it was an issue.
¶107 The State of Montana interjected the environmental mandate of Article IX, Sec. 1(1), of the Montana Constitution for the first time on appeal. It was thrown into the waters, so to speak, as bait in an effort to seduce justices who might otherwise more carefully scrutinize warrantless searches of a private vehicle. Unfortunately, the bait was swallowed by the majority – hook, line and sinker.
¶108 The majority cites to Article IX, Sec. 1(1), in ¶ 22 and then infer that the appointment of game wardens for the protection of fish was done to implement the Constitution's environmental mandate. However, there is no basis for that conclusion. First, the statute referred to by the majority has been in effect in one form or another since 1921, more than 50 years before the constitutional right to a clean and healthful environment was enacted. Second, there is no reference to any legislative history which links the appointment of game wardens to the requirement that "each person shall maintain and improve a clean and healthful environment." Third, the fish which were caught in this case may or may not even

have been part of Montana's natural environment.

¶109 Boyer was charged with catching more than his limit of Sauger or Walleye. If Walleye, "the species is not native to Montana and there is no reliable information regarding the time and place of the first introduction of Walleye into Montana."[1]Furthermore, there are many serious sportsmen who consider the introduction of Walleye detrimental to native fish species and who believe their total eradication would do nothing to detract from Montana's environment. In other words, some would dispute Justice Leaphart's reference to them as among Montana's "treasured wildlife." While I don't personally have the background to take a position on that issue, I simply point it out to demonstrate that something as precious as the constitutional right to a clean and healthful environment shouldn't be cavalierly interjected into a case when something as precious as the constitutional right to privacy hangs in the balance unless there is some factual basis for doing so. Here there is none.

¶110 If this case involved fish habitat, it would be a different matter. However, it merely involves violation of an arbitrary limit set on how many Walleye (a non-native species) can be taken from the river. To suggest that the constitutional right to a clean and healthful environment is implicated without the benefit of any district court argument or factual record will ultimately denigrate respect for this court's future enforcement of the vital protection provided in our Constitution by Article IX.

[1] Dr. Peter Colby and Chris Hunter, Environmental Assessment of the Introduction of Walleye Beyond Their Current Rage in Montana, (1989) p 5.

¶111 For these reasons, I concur with all of Justice Nelson's dissent to the majority opinion other than his discussion which balances the right to a clean and healthful environment with the right of privacy.
/S/ TERRY N. TRIEWEILER