No. 99-126

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 265

STATE OF MONTANA,

Plaintiff and Respondent,

v.

SCOTT DAVID FARABEE,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Lucas J. Foust, Assistant Public Defender, Lewis and Clark County,

Helena, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Stephen C. Bullock,

Assistant Attorney General, Helena, Montana

Mike McGrath, Lewis and Clark County Attorney; Lisa Leckie,

Deputy County Attorney, Helena, Montana

Submitted on Briefs: September 23, 1999

Decided: October 2, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 Scott David Farabee appeals from orders of the First Judicial District Court, Lewis and Clark County, denying his motion to suppress evidence and motion to reconsider. We affirm.

¶2 We restate the issues on appeal as follows:

¶3 1. Whether the District Court erred in determining that the officer who stopped Farabee had the requisite particularized suspicion?

¶4 2. Whether the District Court erred in denying Farabee's motion to suppress evidence on the basis that the traffic stop was pretextual?

## BACKGROUND

¶5 On November 24, 1997, Detectives Scott Rogstad and Vance Gehringer, officers employed by the Helena Police Force and working as part of the Missouri River Drug Task Force, stopped at the house of an individual whom they believed was involved in drug trafficking. The detectives knocked on the door, received no response, and left. Approximately 45 minutes to an hour later, the detectives returned and knocked on the door, identifying themselves as peace officers. No one answered, but the detectives heard something moving about inside. The detectives also noticed that since their previous stop an additional vehicle was parked at the house. They returned to their car and continued their surveillance of the house.

¶6 Sometime thereafter, the detectives saw a man who was later identified as Farabee leave the house and get into a car. They did not know whether or not this was the person

they had been attempting to contact. As Farabee drove away, Detective Gehringer noticed that the car Farabee was driving appeared to be missing a headlight. The detectives stated in their police report that they believed that "it was very possible that [the owner of the house] may had [sic] just completed a drug transaction with the individual that was leaving." The detectives followed Farabee in an unmarked police car and attempted to stop him by flashing their headlights, honking their horn, and showing their badges. Their attempts to pull Farabee over were unsuccessful.

¶7 The detectives radioed other patrol units for assistance in stopping Farabee. Officer Neil Brunett of the Montana Highway Patrol was on patrol in the vicinity, on a side street approaching Valley Drive near East Helena, and heard the detectives' request for assistance. In their request, the detectives stated that they were following Farabee and that they wanted him pulled over for an equipment violation. Officer Brunett heard their request and responded. As Officer Brunett approached Valley Drive he noticed a car driving towards him which appeared to have recently been involved in an accident and appeared to be missing a right headlight and turn signal. Believing that this car was the subject of the request for assistance, Officer Brunett turned on his overhead lights and pulled over Farabee. This was at approximately 1:30 p.m. Officer Brunett observed that Farabee's headlight was missing, and gave Farabee a warning.

¶8 During Officer Brunett's stop, Detectives Rogstad and Gehringer arrived, informed Farabee why they had been surveilling the house he had recently exited, and asked him if they could search his vehicle. Farabee consented. As a result of their search, the detectives discovered bags of marijuana, a scale, pipes, scrapers, a roach clip, and a funnel.

¶9 In an Information filed December 15, 1997, Farabee was charged with one felony count of criminal possession with intent to sell dangerous drugs and one misdemeanor count of possession of drug paraphernalia. Farabee pled not guilty to both counts. On March 6, 1998, Farabee filed a motion to suppress any evidence seized or statements he made on the date of his arrest alleging that the search of his vehicle was conducted in violation of his right to be free from unreasonable searches and seizures. The motion was briefed by both sides and the District Court held a hearing on the motion on March 30, 1998. On April 28, 1998, the District Court denied Farabee's motion to suppress.

¶10 On June 2, 1998, Farabee filed a Motion to Reconsider the District Court's order dated April 28, 1998, on the basis that Officer Brunett's stop was pretextual. The District Court denied Farabee's motion. On January 13, 1999, Farabee pled guilty to both counts,

reserving the right to appeal the orders denying his motion to suppress. The court sentenced Farabee to the Montana Department of Corrections for a period of five years, all suspended subject to certain conditions, for the count of possession with intent to sell, and to a concurrent term of six months in the county jail, with all but seven days suspended upon certain conditions, for the count of possession of illegal drug paraphernalia. Farabee appeals the District Court's denials of his motion to suppress and his motion to reconsider.

## STANDARD OF REVIEW

¶11 We review a district court's denial of a motion to suppress evidence to determine whether the court's finding that the officer involved had a particularized suspicion to justify the investigatory stop is clearly erroneous. *State v. Gilder*, 1999 MT 207, ¶ 7, 295 Mont. 483, ¶ 7, 985 P.2d 147, ¶ 7. We review a district court's conclusions of law regarding a motion to suppress to determine whether the district court's interpretation of the law was correct. *Gilder,* ¶ 7.

## ISSUE ONE

¶12 Whether the District Court erred in determining that the officer who stopped Farabee had the requisite particularized suspicion?

¶13 Farabee contends that Officer Brunett did not have a particularized suspicion that Farabee was committing an offense. Farabee asserts that because he was pulled over at 1:30 p.m., in broad daylight, and with his headlights turned off, Officer Brunett could only speculate that his front headlight was inoperable. The District Court concluded that it was not necessary for the officers to know whether or not Farabee's headlight was actually working before stopping him and found that the totality of the circumstances justified an investigative stop.

¶14 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect persons against unreasonable searches and seizures, including brief investigatory stops of vehicles. *State v. Jarman*, 1998 MT 277, ¶ 9, 291 Mont. 391, ¶ 9, 967 P.2d 1099, ¶ 9 (citing *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S. Ct. 690, 694-95, 66 L. Ed. 2d 621, 628). To stop a person, an officer must have a particularized and objective basis for suspecting the particular person of criminal activity. *Jarman*, ¶ 9 (citing *Brown v. Texas* (1979), 443 U.S. 47, 51, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357, 362). In *State v. Gopher* (1981), 193 Mont. 189, 631 P.2d 293, we

adopted the test announced in *Cortez* and held that in order for the State to prove the existence of a particularized suspicion, the State must show:

> (1) objective data from which an experienced police officer can make certain inferences; and (2) a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing or was witness to criminal activity.

193 Mont. at 194, 631 P.2d at 296. The State has codified the principles set forth in *Gopher* under § 46-5-401, MCA. Whether a particularized suspicion exists to justify an investigative stop is a question of fact which is dependent on the totality of the circumstances. *State v. Lafferty*, 1998 MT 247, ¶ 10, 291 Mont. 157, ¶ 10, 967 P.2d 363, ¶ 10.

¶15 All of the peace officers involved testified that they witnessed Farabee driving a vehicle that appeared to be missing a right headlight. Operating a motor vehicle without two working headlights is a misdemeanor. Under Montana law, both headlights must be in working order at all times. Section 61-9-203(1), MCA, provides that "a motor vehicle . . . must be equipped with at least two headlamps, with at least one on each side of the front of the motor vehicle, that comply with the requirements and limitations set forth in this chapter." Section 61-9-109, MCA, provides:

> (1) It is a misdemeanor for a person to drive or permit to be driven on a highway a vehicle or combination of vehicles that:
>
> . . . .
>
> (b) is not equipped with lamps and other equipment as required in this chapter . . . .
>
> . . . .
>
> (5) All lamps and equipment required by this chapter must be maintained in proper working order and adjustment *at all times*.

(Emphasis added).

¶16 Farabee argues that because he was operating his vehicle during daylight hours without his headlights turned on, the conclusion that his headlight was inoperable was

merely speculative and insufficient to justify an investigative stop. Farabee claims that under our decisions in *State v. Reynolds* (1995), 272 Mont. 46, 899 P.2d 540, and *Grinde v. State* (1991), 249 Mont. 77, 813 P.2d 473, *overruled on other grounds by Bush v. Montana Department of Justice*, 1998 MT 270, 291 Mont. 359, 968 P.2d 716, mere speculation that he may have committed the offense of driving with an inoperable front headlight is insufficient justification for a stop.

¶17 In *Reynolds*, the officer who stopped Reynolds, testified that he observed Reynolds driving through an intersection "bordering on traveling too fast," but that he did not believe Reynolds had "broken the law critically or technically." *Reynolds*, 272 Mont. at 51, 899 P.2d at 543. As is clear from the testimony we quoted above, we held that the State did not bear its burden of proof in *Reynolds* because there was no actual suspicion; the officer who made the stop did not actually suspect Reynolds was speeding.

¶18 In *Grinde*, the basis of the officers' particularized suspicion was that after Grinde's vehicle had made a right-hand turn and was no longer in sight, the officers heard "a squealing of tires and the sound of an engine revving up." *Grinde*, 249 Mont. at 78, 813 P.2d at 474. We held that the State did not bear its burden of proof in *Grinde* because the officers did not observe Grinde driving in what they suspected to be an illegal manner. Their suspicion was not particularized; from the circumstances there was no reason to infer that it was Grinde who was operating his car unlawfully.

¶19 Farabee's reliance on these cases is misplaced. Unlike *Grinde*, the officers' suspicions were particularized. All three officers testified that they personally witnessed Farabee operating a car that appeared to be missing a right headlight. From this objective and particularized data, the officers made the reasonable inference that Mr. Farabee's right headlight was inoperable. Thus, unlike *Reynolds*, the officers involved in this case actually suspected Farabee was operating his vehicle without two working headlights in violation of § 61-9-104, MCA. Lastly, we note that a particularized suspicion does not require certainty on the part of the law enforcement officer. *State v. Dawson*, 1999 MT 171, ¶ 18, 295 Mont. 212, ¶ 18, 983 P.2d 916, ¶ 18. Accordingly, we conclude that the District Court's finding that Officer Brunett had an objective and particularized suspicion that Farabee was engaged in wrongdoing that justified an investigative stop is not clearly erroneous.

¶20 We note that Farabee also asserts that Detectives Rogstad and Gehringer exceeded the scope of the stop by asking for consent to search the interior of Farabee's vehicle.

However, as the State observes, Farabee did not raise this issue during the District Court proceedings. As a general rule, this Court will not review an issue which the defendant fails to present to the district court. *State v. Herrera*, 1998 MT 173, ¶ 18, 289 Mont. 499, ¶ 18, 962 P.2d 1180, ¶ 18.

## ISSUE TWO

¶21 Whether the District Court erred in denying Farabee's motion to suppress evidence on the basis that the traffic stop was pretextual?

¶22 Farabee contends that the detectives had a hunch that he was involved in narcotics activity, but insufficient cause to stop him based on that hunch. Therefore, Farabee argues that the detectives used the equipment violation as a pretext to stop him and investigate their hunch. Farabee asserts that because the traffic stop was "pretextual," it was unlawful under Article II, Sections 10 and 11 of the Montana Constitution. Farabee acknowledges that in *Whren v. United States* (1996), 517 U.S. 806, 116 S. Ct. 1796, 135 L. Ed. 2d 89, the United States Supreme Court concluded that an officer's motive for a traffic stop does not render an objectively reasonable stop invalid under the federal constitution. However, Farabee argues that we should decline to follow *Whren* for three reasons. Farabee asserts that pursuant to *State v. Lahr* (1977), 172 Mont. 32, 560 P.2d 527, pretextual stops are illegal in Montana. Farabee also asserts that *Whren* is at odds with Montana's constitutional right to privacy. Lastly, Farabee contends that the *Whren* decision failed to account for the enormity of the traffic code as a whole and thus the wide variety of traffic offenses that can be used to justify a stop.

¶23 The United States Supreme Court has stated that the constitutional reasonableness of a traffic stop under the Fourth Amendment does not depend on the subjective motivations of the individual officers involved. *Whren*, 517 U.S. at 813, 116 S. Ct. at 1774. In *Whren*, plainclothes police officers, patrolling a "high drug area" of the District of Columbia in an unmarked car, became suspicious when they noticed a truck with temporary license plates and youthful African-American occupants waiting at a stop sign for more than 20 seconds. When the officers executed a U-turn to head back for another look, the truck turned without signaling and sped off at an "unreasonable" speed. The officers caught up with the truck at a stop light and pulled alongside. While approaching the driver's door, one of the officers observed what was later identified as crack cocaine in the hands of one of the passengers.

¶24 The Petitioners in *Whren* acknowledged that the officers had probable cause to believe that they had violated various provisions of the District of Columbia traffic code. Nevertheless, they argued that because the use of automobiles is so highly regulated that total compliance with the laws governing vehicles is nearly impossible, an officer can almost invariably catch any given motorist in a technical violation of the law. They argued that this creates a temptation to use traffic stops as a means of investigating other law violations for which an officer does not have probable cause or even an articulable suspicion. The Petitioners contended that to avoid this danger, the Fourth Amendment test for traffic stops should not be whether probable cause exists to justify the stop, but rather, whether an officer's conduct deviated materially from usual police practices such that a reasonable officer in the same circumstances would not have made the stop for the reason given. *Whren*, 517 U.S. at 813-14, 116 S. Ct. at 1774.

¶25 Justice Scalia, writing for a unanimous Supreme Court, rejected the rule proposed by the Petitioners. The Court observed that the "would have" standard proposed by the Petitioners would be difficult to apply-requiring courts to speculate about the hypothetical reaction of a hypothetical police officer-and would vary from place to place and time to time with changing police enforcement tactics. *Whren*, 517 U.S. at 815, 116 S. Ct. at 1775. The Court stated that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Whren*, 517 U.S. at 814, 116 S. Ct. at 1775 (citations omitted).

¶26 Farabee asks us to adopt the same standard rejected by the United States Supreme Court in *Whren* by following our decision in *Lahr* and holding that pretextual traffic stops are unlawful. However, *Lahr* does not stand for the proposition that a traffic stop supported by probable cause or reasonable suspicion is nonetheless unlawful because it was used as a "pretext" to investigate other criminal activity for which the officer did not have a reasonable suspicion. In *Lahr,* Deputy Sirucek, a sheriff's deputy on duty in Denton, Montana, observed a package exchanged between the defendant, Lahr, and a person who had been previously arrested for drug-related offenses. Lahr left Denton shortly thereafter, heading towards Lewistown. Deputy Sirucek radioed a second deputy, Deputy Cordle, informed him of the transaction, and told him to "pick [Lahr] up . . . to see what [he was] up to." Deputy Cordle followed closely behind Lahr in an unmarked patrol car for approximately three miles. Lahr testified that he thought that Deputy Cordle's vehicle was following him so closely as to create a dangerous situation, so he slowed down and attempted to wave the vehicle past him. Deputy Cordle testified that after observing Lahr swerve over the centerline of the highway twice and go onto the shoulder

three times he considered Lahr's manner of driving reckless and pulled him over. During the stop, Deputy Cordle observed what he believed to be marijuana between the front seats of Lahr's car. Deputy Cordle never charged Lahr with a driving violation.

¶27 We held that neither deputy had probable cause to arrest Lahr. Deputy Sirucek, who witnessed the suspicious exchange in Denton, testified that he had no grounds for an arrest. We observed that Deputy Cordle, the one who actually stopped Lahr, never issued Lahr a traffic citation and we concluded that he used the traffic stop as a pretext to investigate the mere suspicion that Lahr was involved in a drug transaction. *Lahr*, 172 Mont. at 35, 560 P.2d at 529.

¶28 The basis of our holding was not, as Farabee suggests, that Deputy Cordle used an otherwise justifiable traffic stop as an unlawful means to investigate a mere suspicion. Rather, we held that the traffic stop was not justified because either Deputy Cordle did not actually witness Lahr driving recklessly, or Deputy Cordle caused Lahr's erratic driving by following too closely. Our conclusion was based on the fact that Lahr testified that Deputy Cordle was following him too closely; Deputy Cordle had been instructed to pull Lahr over and see what he was up to; and Deputy Cordle did not issue Lahr a traffic citation. In this regard, Justice Haswell's dissent is enlightening:

> The majority point out that the defendant was never arrested on the traffic charge and therefore conclude that the traffic offense either did not occur or that it was a subterfuge to get a look in the defendant's car. . . . What the majority have done here is accept the version of the defendant that his erratic driving was the result of tailgating by Deputy Cordle in preference to Deputy Cordle's version to the contrary.

*Lahr, 172 Mont. at 37, 506 P.2d at 530.*

¶29 Therefore, *Lahr* might be applicable if Farabee could prove that the officers involved in his stop never actually had a reasonable suspicion that his headlight was inoperable. *Lahr* might also be applicable if Farabee could prove that the detectives somehow manufactured reasonable suspicion (e.g., by breaking his headlight) in order to create a justifiable traffic stop and investigate their hunch that he had participated in a drug transaction. We have never held, however, that an otherwise objectively justifiable traffic stop is nonetheless unlawful because a law enforcement officer used the stop to investigate a hunch about other criminal activity.

¶30 Alternatively, Farabee argues that we should decline to follow *Whren* in judging the lawfulness of a traffic stop because doing so infringes on Montana's constitutional right to privacy under Article II, Section 10. Farabee correctly observes that we have held that Montana's unique constitutional language affords citizens a greater right to privacy, and, therefore, may create broader protection than the Fourth Amendment in cases involving searches and seizures. *See State v. Bullock* (1995), 272 Mont. 361, 383, 901 P.2d 61, 75. However, we have repeatedly held that the lawfulness of a traffic stop under the Montana Constitution depends on whether the officer had a particularized suspicion that an occupant of the vehicle has committed or is committing an offense. *See, e.g., State v. Halvorson,* 2000 MT 56, ¶ 8, 997 P.2d 751, ¶ 8, 57 St. Rep. 270, ¶ 8; *Gopher*, 193 Mont. at 194, 631 P.2d at 296. More importantly, there is no reason to believe that the right of privacy created by Article II, Section 10 of the Montana Constitution is implicated by these facts. Operating a vehicle without two operable headlights in violation of state law is certainly not one of the core individual interests protected by the right to privacy. *See Armstrong v. State*, 1999 MT 261, ¶ 35, 296 Mont. 361, ¶ 35, 989 P.2d 364, ¶ 35 (observing that "Article II, Section 10 of the Montana Constitution was intended by the delegates to protect citizens from illegal private action and from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private").

¶31 Lastly, Farabee contends that we should not follow *Whren* because the United States Supreme Court failed to take account of the traffic code as a whole in reaching its decision. However, the Court specifically addressed this very same argument, stating:

> [W]e are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement. And even if we could identify such exorbitant codes, we do not know by what standard (or what right) we would decide, as petitioners would have us do, which particular provisions are sufficiently important to merit enforcement.

*Whren, 517 U.S. at 818-19, 116 S. Ct. at 1777. We agree.*

¶32 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY