FILED

May 31 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0551

DA 15-0551

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 128

CHRISTOPHER BRUNETTE,

      Petitioner and Appellant,

  v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Glacier, Cause No. DV 15-22
Honorable Robert G. Olson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Terryl T. Matt, Matt Law Office, PLLC, Cut Bank, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

          Robert A. Smith, Attorney at Law, Cut Bank, Montana

                Submitted on Briefs:  April 6, 2016

                        Decided:  May 31, 2016

Filed:

                              Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Christopher Brunette appeals the order of the Ninth Judicial District Court, Glacier County, denying his petition for reinstatement of his driver's license. We address Brunette's claims on appeal under a single issue:

> *Whether the District Court erred in denying Brunette's petition to reinstate his driver's license.*

¶2 We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 On April 11, 2015, Officer Brandon Brotnov was on patrol in Cut Bank, Montana. At 12:54 a.m., the police department dispatch received a call from an unknown officer to run a license plate check on Brunette's vehicle, which was parked on Central Avenue. Officer Robert Snyder also was on patrol that night and told Officer Brotnov about Brunette's vehicle.

¶4 Sometime later, Officer Brotnov observed Brunette's vehicle parked on Central Avenue. When Officer Brotnov drove past Brunette's parked vehicle, Brunette turned around and headed in the opposite direction. Officer Snyder and Officer Brotnov continued to patrol the area and discussed Brunette's whereabouts; a portion of a transcript of radio communication between Officer Brotnov and Officer Snyder makes clear that the Officers discussed Brunette's whereabouts for approximately five minutes. During this time, Officer Brotnov observed Brunette pull over and change directions twice. Officer Brotnov began to follow Brunette, observed him make a right-hand turn without using his turn signal, and initiated a traffic stop at approximately 1:40 a.m.

2

¶5     At the time Brunette made the turn, Officer Snyder was approaching in the oncoming lane. Officer Brotnov testified that his report indicated that after witnessing Brunette fail to use his turn signal, but prior to initiating the traffic stop, he observed Brunette almost strike a parked vehicle. At the hearing, however, Officer Brotnov testified, after viewing footage from his dash cam, that he was mistaken about Brunette almost striking the vehicle.

¶6     After stopping Brunette, and before leaving his vehicle, Officer Brotnov had dispatch begin the suggested deprivation period.[1] Officer Brotnov approached Brunette's vehicle and detected a slight odor of an alcoholic beverage and cigarette smoke. Officer Brotnov observed Brunette have difficulty retrieving his driver's license and the vehicle's registration and insurance. Brunette explained to Officer Brotnov that he was unsure of where the registration and insurance were because it was a company vehicle. Officer Brotnov observed further that Brunette's eyes were red and watery and that his speech was slurred. Upon questioning, Brunette admitted that he had consumed alcoholic beverages that evening.

¶7     Officer Brotnov then administered standardized field sobriety tests, including a portable breath test (PBT). The PBT indicated a blood alcohol concentration of 0.143. Officer Brotnov placed Brunette under arrest for driving under the influence in violation of § 61-8-401, MCA. At the detention center, Brunette refused to submit to an

---

[1] The "deprivation period," formerly contained in the Administrative Rules of Montana, required an officer to observe the person for fifteen minutes before administering a breath test. *State v. Flaherty*, 2005 MT 122, ¶ 9, 327 Mont. 168, 112 P.3d 1033, *superseded by rule as stated in State v. Levanger*, 2015 MT 83, ¶¶ 9-14, 378 Mont. 397, 344 P.3d 984.

Intoxilyzer breath test and his driver's license was suspended pursuant to § 61-8-402, MCA.

¶8 On April 20, 2015, Brunette filed a petition to reinstate his driver's license pursuant to § 61-8-403, MCA. In the petition, he argued that Officer Brotnov did not have reasonable grounds to conduct the stop. The District Court held an evidentiary hearing on May 20, 2015. During Officer Brotnov's testimony, Brunette's counsel questioned him about his case report and played the dash cam video and the body cam recording, but did not offer or enter any of these items into evidence.

¶9 At the hearing's conclusion, the District Court made a number of oral findings. The court expressed "concerns about officer conduct on that night." Those concerns included: that an officer "ran" Brunette's license plate nearly an hour before he was pulled over; that the Officers discussed Brunette's whereabouts and may have been "targeting this individual"; and that Officer Brunette began the suggested deprivation period before his initial contact with Brunette. The court found, however, that "clearly there was a lack of a turn signal that was a traffic stop." The court found further that the turn signal violation, the watery eyes, and the PBT "may be sufficient" to create reasonable suspicion, "along with the other factors." The District Court ultimately directed counsel to brief the officer conduct issues because it was unsure whether those issues "create[ ] a problem."

¶10 Both parties submitted briefs following the evidentiary hearing addressing the issues about which the District Court expressed concerns. In his briefing, Brunette alleged for the first time that Officer Snyder failed to dim his high-beam lights as he was

4

approaching Brunette in the oncoming lane, which Brunette claimed contributed to his failure to use his turn signal. Brunette's brief also contained a portion of the transcript of the radio exchange between Officer Snyder and Officer Brotnov, which he obtained after the hearing. The District Court issued its order denying Brunette's petition to reinstate his driver's license on August 17, 2015. The court's order focused on whether the stop was pretextual. Brunette appeals.

## STANDARD OF REVIEW

¶11 We review a district court's ruling on a petition for reinstatement of a driver's license to determine whether the court's findings of fact are clearly erroneous. *Kummerfeldt v. State*, 2015 MT 109, ¶ 8, 378 Mont. 522, 347 P.3d 1233. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Kummerfeldt*, ¶ 8. We review a district court's conclusions of law to determine if they are correct. *Kummerfeldt*, ¶ 8. The suspension of a driver's license is presumed to be correct; therefore, the petitioner bears the burden of proving that the State's action was improper. *Brown v. State*, 2009 MT 64, ¶ 8, 349 Mont. 408, 203 P.3d 842.

## DISCUSSION

¶12 *Whether the District Court erred in denying Brunette's petition to reinstate his driver's license.*

¶13 In a driver's license reinstatement proceeding, a district court is limited to considering the issues set forth in § 61-8-403(4)(a), MCA. Section 61-8-403(4)(b),

5

MCA; *Kummerfeldt*, ¶ 10 (citing *Ditton v. DOJ Motor Vehicle Div.*, 2014 MT 54, ¶ 30, 374 Mont. 122, 319 P.3d 1268). Relevant here, the issues include whether:

> (i) a peace officer had reasonable grounds to believe that the person had been driving or was in actual physical control of a vehicle upon ways of this state open to the public while under the influence of alcohol, drugs, or a combination of the two and the person was placed under arrest for violation of 61-8-401 or 61-8-465;

> .   .   .

> (iv) the person refused to submit to one or more tests designated by the officer.

Section 61-8-403(4)(a)(i), (iv), MCA. It is undisputed that Brunette refused to submit to a breath test; therefore, the court's focus was limited to the factors set forth in § 61-8-403(4)(a)(i), MCA.

## A. The Record on Appeal

¶14 We first address the record on appeal. In his briefing to this Court, Brunette claims that the dash cam video shows that Officer Snyder had his high-beam lights on as he approached Brunette and "that Officer Brotnov clearly failed to stop at a stop sign and yield at a yield sign as he pursued Mr. Brunette." Because the Officers broke the traffic code, Brunette claims that any evidence obtained through the Officers' wrongdoing should be excluded. Brunette also references evidence obtained from the body cam recording. Brunette contends that the dash cam video "of the stop was viewed, discussed at length, and consistently referred to during the hearing," and that it was "merely an oversight not to have admitted it into evidence." Brunette argues "that the video is incorporated through reference and should be admitted." Brunette relies extensively on a

6

portion of the transcript of Officer Brotnov's and Officer Snyder's radio communications in asserting that the stop was pretextual. Brunette argues that the State failed to provide the radio transcript before the hearing. Moreover, Brunette contends that the radio transcript is part of the record because a portion of the radio transcript was included in his initial brief to the District Court.

¶15 The State counters by arguing that Brunette's reference to and reliance on the Officers' radio exchange transcript, the dash cam video, and the body cam recording violate the Montana Rules of Appellate Procedure because they are outside of the record on appeal. Accordingly, the State requests that this Court disregard any reference to the facts allegedly obtained from those sources.

¶16 This Court considers only the district court record, including "the original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district court." M. R. App. P. 8(1). "[P]arties on appeal are bound by the record." *State v. MacKinnon*, 1998 MT 78, ¶ 15, 288 Mont. 329, 957 P.2d 23 (quoting *State v. Hatfield*, 256 Mont. 340, 344, 846 P.2d 1025, 1028 (1993)) (internal quotation marks omitted). Although the dash cam video and the body cam recording were both played at the hearing, neither was offered or entered into evidence and they are not included in the District Court record. Accordingly, we will not consider references to this evidence on appeal. *State v. J.C.*, 2004 MT 75, ¶ 26, 320 Mont. 411, 87 P.3d 501 (concluding that the documents the defendant "attached to his appellate brief are not part of the District Court record and will not be considered on appeal"). Brunette's brief to the District Court in support of his driver's license

7

reinstatement did include a portion of the radio transcript between Officer Snyder and Officer Brotnov. That portion of the transcript is therefore part of the District Court record properly before this Court on appeal. M. R. App. P. 8(1).[2]

**B. Grounds for the Stop**

¶17 Particularized suspicion for Officer Brotnov's initial stop of Brunette's vehicle is determined by "examining the totality of the circumstances confronting the officer at the time." *Ditton*, ¶ 30. In order for an officer to have particularized suspicion, the officer must demonstrate: "(1) objective data and articulable facts from which he or she can make certain reasonable inferences; and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense." *Brown*, ¶ 20. It is well established that "[a] statutory violation alone is sufficient to establish particularized suspicion for an officer to make a traffic stop." *Kummerfeldt*, ¶ 11 (quoting *State v. Schulke*, 2005 MT 77, ¶ 16, 326 Mont. 390, 109 P.3d 744) (internal quotation marks omitted).

¶18 The District Court found—and it is undisputed—that "Brunette failed to utilize his turn signal." Such a "statutory violation alone is sufficient to establish particularized suspicion" for the initial investigative stop. *Kummerfeldt*, ¶ 11. Brunette contends, however, that the District Court incorrectly concluded that Officer Brotnov's basis for the stop was legal because Officer Brotnov lacked objectivity. He claims the court erred by

---

[2] Brunette has included a more complete transcript of the Officers' radio communications in an appendix to his briefing on appeal. Because parties "may not add additional matters in briefs or appendices," however, we will not consider the complete transcript on appeal. *MacKinnon*, ¶ 15 (quoting *Hatfield*, 256 Mont. at 344, 846 P.2d at 1028) (internal quotation marks omitted).

relying on *State v. Farabee*, 2000 MT 265, 302 Mont. 29, 22 P.3d 175, and asserts that this case is more analogous to *State v. Lahr*, 172 Mont. 32, 560 P.2d 527 (1977). He asserts that unlike in *Farabee*, here, Officer Brotnov observed no wrongdoing before following Brunette. Brunette contends that, similar to *Lahr*, "the Officers manufactured a traffic stop" because "[t]hey coordinated their movements over the radio so they could intercept Mr. Brunette." Brunette relies on the radio transcript and the purported footage from the dash cam video to support his contentions.

¶19    Brunette's reliance on *Lahr* is misplaced. In *Lahr*, a deputy sheriff in Denton, Montana, observed a package exchanged between the defendant, Lahr, and a man with previous drug related arrests. *Lahr*, 172 Mont. at 33, 560 P.2d at 528. After Lahr left Denton and headed toward Lewistown, Montana, the deputy radioed a second deputy in Lewistown and told him to "pick [Lahr] up . . . and see what [he was] up to." *Lahr*, 172 Mont. at 33, 560 P.2d at 528. The deputy in Lewistown waited for Lahr's vehicle and followed him in an unmarked police car "for approximately three miles at a distance of one to four car lengths." *Lahr*, 172 Mont. at 33, 560 P.2d at 528. The deputy testified that he observed Lahr swerve over the centerline of the highway and go onto the shoulder. *Lahr*, 172 Mont. at 34, 560 P.2d at 528. Lahr testified that he thought the vehicle was following him too closely and that he was attempting to have the vehicle pass him. *Lahr*, 172 Mont. at 34, 560 P.2d at 528. The deputy pulled Lahr over for reckless driving, observed what he believed to be marijuana in the car, and arrested Lahr. *Lahr*, 172 Mont. at 34, 560 P.2d at 528-29.

¶20 On appeal, Lahr contended that the arrest was invalid because the deputies lacked probable cause. We concluded that it was "clear that neither [deputy] had probable cause to arrest Lahr" because they had nothing more than a suspicion that an illegal transaction had taken place. *Lahr*, 172 Mont. at 35, 560 P.2d at 529. We reiterated that "good faith or mere suspicion on the part of arresting officers is not enough" for probable cause. *Lahr*, 172 Mont. at 35, 560 P.2d at 529. Accordingly, we concluded, "Clearly, the traffic stop was merely a pretext used by [the arresting deputy] to follow up on the call received from [the other deputy]. Hence, [the arresting deputy] was also acting on a mere suspicion." *Lahr*, 172 Mont. at 35, 560 P.2d at 529.

¶21 In *Farabee*, the defendant relied on *Lahr* to argue that the officers used a statutory violation "as a pretext to stop him and investigate their hunch" that he was involved in narcotics activity. *Farabee*, ¶ 22. We analyzed *Lahr* and concluded that the basis of our holding there was not that the deputy "used an otherwise justifiable traffic stop as an unlawful means to investigate a mere suspicion. Rather, we held that the traffic stop was not justified because either [the deputy] did not actually witness Lahr driving recklessly, or [the deputy] caused Lahr's erratic driving by following too closely." *Farabee*, ¶ 28. Accordingly, we noted, "*Lahr* does not stand for the proposition that a traffic stop supported by probable cause or reasonable suspicion is nonetheless unlawful because it was used as a 'pretext' to investigate other criminal activity for which the officer did not have a reasonable suspicion." *Farabee*, ¶ 26.

¶22 In fact, in *Farabee* we noted approvingly that the "United States Supreme Court has stated that the constitutional reasonableness of a traffic stop under the Fourth

10

Amendment does not depend on the subjective motivations of the individual officers involved." *Farabee*, ¶ 23 (citing *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996)). We declined to conclude that the right to privacy under Article II, Section 10, of the Montana Constitution affords citizens greater protection than that provided by the Fourth Amendment when judging the lawfulness of a traffic stop; we reasoned that "the lawfulness of a traffic stop under the Montana Constitution depends on whether the officer had a particularized suspicion that an occupant of the vehicle has committed or is committing an offense." *Farabee*, ¶ 30 (citations omitted). *Accord State v. Crawford*, 2016 MT 96, ¶ 21, 383 Mont. 229, ___ P.3d ___ (and concluding that "our precedent has long established that inquiry into the subjective motivations of law enforcement . . . is inappropriate in assessing the validity of an arrest").

¶23 The instant case is distinguishable from *Lahr*. "*Lahr* might be applicable if [Brunette] could prove that the officers involved in his stop never actually had a reasonable suspicion that [there was a statutory violation]." *Farabee*, ¶ 29. It is undisputed, however, that Brunette failed to use his turn signal in violation of § 61-8-336, MCA. Brunette has failed to show that Officer Brotnov did not have reasonable suspicion for the investigatory stop.

¶24 "*Lahr* might also be applicable if [Brunette] could prove that the [officers] somehow manufactured reasonable suspicion . . . in order to create a justifiable traffic stop and investigate their hunch." *Farabee*, ¶ 29. Although the District Court found that Officer Snyder's high-beam lights were on as he was approaching Brunette in the oncoming lane, the court ultimately concluded that "it appears that the arresting officers

11

did not contribute to or cause Brunette's signaling violation." Unlike in *Lahr*, Brunette did not testify that the Officers' actions contributed to his failure to use his turn signal. In fact, he testified that he "remember[ed] seeing a car coming towards" him and, when he was asked why he didn't use his turn signal, he responded, "I just guess I forgot."

¶25 This case is further distinguishable from *Lahr* because in that case the arresting deputy was instructed to pick Lahr up based on a mere suspicion, proceeded to wait for Lahr while he traveled from Denton to Lewistown, and then followed him closely for three miles before observing the erratic driving. Here, the portion of the radio transcript between Officer Snyder and Officer Brotnov demonstrates that the Officers communicated about Brunette's whereabouts for approximately five minutes prior to the traffic stop and that Officer Brotnov was not following him for more than a few blocks. While the evidence reveals that Officer Snyder told Officer Brotnov about Brunette's vehicle, it does not demonstrate that Officer Snyder instructed Officer Brotnov to pick up Brunette. Moreover, after Officer Snyder told Officer Brotnov about Brunette's vehicle, Officer Brotnov witnessed Brunette pull over and change directions twice prior to observing the turn signal violation. Contrary to Brunette's assertions, the transcript does not demonstrate that "the Officers decided to pick up Mr. Brunette long before they witnessed a traffic violation." The transcript demonstrates only that the Officers were aware of Brunette's vehicle and that they discussed Brunette's whereabouts.

¶26 Brunette claims that pretext is apparent from Officer Brotnov's beginning the suggested deprivation period prior to his initial contact with Brunette. While previous versions of the Administrative Rules of Montana required an officer to comply with a

checklist that included observing a deprivation period before administering a breath test, *State v. McGowan*, 2006 MT 163, ¶ 16, 322 Mont. 490, 139 P.3d 841, the current version of the rules has no such requirement, Admin. R. M. 23.4.212 (2012); *Levanger*, ¶ 12. Whatever Officer Brotnov's intentions may have been for starting the deprivation period when he did, they have no bearing on the analysis in this case because the reasonableness of a traffic stop "does not depend on the subjective motivations of the individual officers involved." *Farabee*, ¶ 23 (citing *Whren*, 517 U.S. at 813, 116 S. Ct. at 1774).

¶27 Brunette also contends that the evidence demonstrates that there were several inconsistencies with Officer Brotnov's testimony. He therefore asserts that the District Court erred by finding that the traffic stop was objectively reasonable.

¶28 We are unpersuaded by Brunette's contention. The record demonstrates that Brunette questioned Officer Brotnov about the alleged inconsistencies during the hearing. Moreover, Brunette included a portion of the radio transcript—which he claims demonstrates further the inconsistencies in Officer Brotnov's testimony—in his briefing to the District Court. The District Court therefore had the opportunity to consider this evidence. It is well-established that "because an assessment of testimony is best made upon observation of the witness's demeanor and consideration of other intangibles that are only evident during live testimony, the fact-finder is uniquely in the best position to judge the credibility of witnesses." *Ditton*, ¶ 33 (citations omitted). As such, we "defer to the trial court regarding the credibility of [Officer Brotnov] and the weight to be accorded [his] testimony." *Ditton*, ¶ 33.

¶29   After reviewing the available record on appeal, we conclude that Brunette has not met his "burden of proving that the State's action was improper." *Brown*, ¶ 8. Accordingly, we conclude that the District Court correctly relied on *Farabee* in determining that the stop was "objectively reasonable" and that there was "no evidence that this failure [to use a turn signal] was caused by law enforcement." The District Court correctly concluded that "the necessary particularized suspicion existed" for the initial stop.

### C. The Statutory Factors

¶30   Brunette next claims that the District Court failed to consider adequately the necessary issues in a driver's license reinstatement proceeding. Brunette does not dispute that he refused to submit to a breath test. He contends, however, that the District Court erred by failing to make the other findings necessary under § 61-8-403(4)(a), MCA, to support its order—whether Officer Brotnov had reasonable grounds to believe Brunette was under the influence of alcohol and whether Brunette was lawfully placed under arrest. Although Brunette concedes that he failed to use his turn signal, he nevertheless asserts that Officer Brotnov failed to establish objective data from which he could infer that Brunette was under the influence of alcohol both prior to and during the investigative stop. Brunette accordingly asserts that Officer Brotnov lacked the necessary particularized suspicion to administer the field sobriety tests. Brunette asserts further that because Officer Brotnov lacked particularized suspicion, Officer Brotnov likewise lacked probable cause to arrest him.

14

¶31 The State asserts that although the court's written findings do not explicitly discuss the issues relevant to a driver's license reinstatement proceeding, the court's order was supported by the evidence at the hearing, by its oral findings at the hearing's conclusion, and by the doctrine of implied findings. The State contends that Officer Brotnov had particularized suspicion to support the investigative stop because Brunette failed to use his turn signal. Furthermore, the State asserts, Officer Brotnov's observations after the stop "established sufficient grounds to form a reasonable belief that Brunette was driving under the influence." Finally, the State contends that Officer Brotnov's particularized suspicion ripened into probable cause to arrest Brunette because Officer Brotnov observed indicators of impairment and, based on those indicators, administered field sobriety tests, which established probable cause for arrest.

### 1. Reasonable Grounds

¶32 The "reasonable grounds" requirement in § 61-8-403(4)(a)(i), MCA, "is the equivalent of the 'particularized suspicion' standard necessary to make an investigative stop." *Kummerfeldt*, ¶ 11 (citing *Ditton*, ¶ 30). We are unpersuaded by Brunette's contention that Officer Brotnov lacked particularized suspicion to conduct the field sobriety tests. Officer Brotnov testified that, once he approached Brunette, he made the following observations: he smelled the odor of an alcoholic beverage; Brunette had red, watery eyes; Brunette's speech was slurred; Brunette had difficulty getting his license out of his wallet; and Brunette admitted to consuming alcohol. Such objective data and articulable facts are sufficient for particularized suspicion that a person is under the influence of alcohol. *E.g., Brown*, ¶ 23 (concluding that an officer had particularized

15

suspicion that a driver was under the influence of alcohol based, in part, on the officer's observations of an odor of alcohol, slurred and slow speech, and slow, staggered movements); *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶ 42, 289 Mont. 1, 961 P.2d 75 (concluding that an officer's observations of an odor of alcohol, bloodshot eyes, and the driver's difficulty producing her driver's license constituted "objective data [that] further established that [the officer] had a separate particularized suspicion that [the driver] was driving while under the influence of alcohol, and, therefore, [the officer's] administration of field sobriety tests was a constitutionally permissible search").

¶33 We similarly are unpersuaded that the District Court made inadequate findings regarding whether Officer Brotnov had reasonable grounds to believe that Brunette was driving under the influence of alcohol. We will not overturn a district court's decision if its findings of fact and conclusions of law "are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and are supported by evidence." *State v. Whiteman*, 2005 MT 15, ¶ 12, 325 Mont. 358, 106 P.3d 543. The District Court made the following relevant oral findings at the evidentiary hearing's conclusion:

> I think we got [sic] a failure to use a turn signal, that's considered, and I think we got [sic] watery eyes and we have a P.B.T.
>
> [B]ut clearly the stop was made, there was no blinker used. And if -- if that's enough to create reasonable suspicion along with the other factors, it may be sufficient.

Such oral findings are appropriate for consideration under our precedent. *See State v. Flemings*, 2008 MT 229, 344 Mont. 360, 188 P.3d 1020 (affirming a district court's determination that an officer had particularized suspicion after analyzing the court's oral

16

findings of fact and conclusions of law); *State v. Todd*, 2005 MT 108, 327 Mont. 65, 111 P.3d 677 (affirming a district court's determination that an officer had particularized suspicion after analyzing the court's oral findings of fact and conclusions of law). Furthermore, the District Court expressly found in its written order that "the stop was objectively reasonable and the necessary particularized suspicion existed." We conclude that the District Court's oral and written findings are supported by the evidence and are "sufficiently comprehensive and pertinent to the issues to provide a basis for decision," *Whiteman*, ¶ 12, regarding whether Officer Brotnov "had reasonable grounds to believe that [Brunette] had been driving . . . while under the influence of alcohol," Section 61-8-403(4)(a)(i), MCA.

### 2. The Arrest

¶34 Section 61-8-403(4)(a)(i), MCA, requires a court to examine and consider also whether "the person was placed under arrest for violation of 61-8-401." In determining whether a person was placed under arrest under § 61-8-403(4)(a)(i), MCA, a court "must consider whether an officer had the right to make the arrest." *Hulse*, ¶ 13. "An officer has the right to make an arrest if the arrest is supported by probable cause." *Hulse*, ¶ 13. Probable cause "exists when the facts and circumstances within the arresting officer's personal knowledge are sufficient to warrant a reasonable person to believe that the suspect has committed an offense." *Hulse*, ¶ 13.

¶35 Here, in addition to Officer Brotnov's observations regarding the smell of alcohol, red and watery eyes, slurred speech, difficulty retrieving driver's license, and admission of alcohol consumption, Officer Brotnov administered field sobriety tests, including a

17

PBT. The PBT indicated that Brunette's blood alcohol concentration was 0.143, well in excess of the legal limit. These facts and circumstances are sufficient for probable cause to believe that Brunette was driving under the influence. Brunette therefore was validly arrested. *Brown*, ¶ 23 (concluding that the officer's objective observations—e.g., an odor of alcohol, slurred and slow speech, and slow, staggered movements—allowed the officer's "particularized suspicion to escalate into probable cause for a DUI arrest"); *Hulse*, ¶ 73 (concluding that even without the evidence of one of the field sobriety test results, "sufficient evidence remains to support a finding that [the officer] had probable cause to arrest [the defendant] for driving under the influence, and, therefore, that [the defendant's] arrest was valid" based in part on the officer's observations of the other field sobriety tests, an odor of alcohol, bloodshot eyes, and the driver's difficulty producing her driver's license).

¶36 Brunette correctly points out that the District Court's order does not address whether Officer Brotnov had probable cause to arrest him for driving under the influence. We have, however, long adhered "to the doctrine of implied findings[,] which states that where a court's findings are general in terms, any findings not specifically made, but necessary to the judgment, are deemed to have been implied, if supported by the evidence." *Interstate Brands Corp. v. Cannon*, 218 Mont. 380, 384, 708 P.2d 573, 576 (1985). Under this doctrine, "we may consult hearing transcripts in addition to the written findings." *In re S.M.*, 2014 MT 309, ¶ 28, 377 Mont. 133, 339 P.3d 23.

¶37 As stated above, a district court is limited to considering certain issues in a driver's license reinstatement proceeding—one of which is whether "the person was

18

placed under arrest." Section 61-8-403(4)(a)(i), MCA. That consideration requires a court to determine "whether an officer had the right to make the arrest," which necessarily requires a conclusion that the officer had probable cause. *Hulse*, ¶ 13. Here, the District Court found generally that "Brunette was ultimately arrested and charged with driving while under the influence of alcohol." The court found specifically that "the stop was objectively reasonable," and orally found that there were indicators of intoxication—the watery eyes and the PBT that, "along with the other factors . . . may be sufficient" to uphold the suspension. The court's general and specific findings necessarily include implied findings sufficient to conclude that Officer Brotnov had probable cause to arrest Brunette. As demonstrated above, the evidence supports such a determination. Accordingly, we conclude that the District Court's failure to specifically address whether Officer Brotnov had probable cause to place Brunette under arrest does not constitute reversible error.

## CONCLUSION

¶38 The District Court's order denying Brunette's motion to reinstate his driver's license is affirmed.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER
/S/ JIM RICE

19

Justice Laurie McKinnon, dissenting.

¶39 In my opinion the Court errs when it combs the record and plucks those facts it believes are relevant to an arrest for DUI, misplacing them into its legal analysis of an investigative stop and, particularly, the statutory requirements concerning reinstatement of Brunette's driver's license. The findings made by the District Court do not support a determination of particularized suspicion to administer field sobriety tests, which was the basis for Brunette's arrest for DUI and subsequent seizure of his license. Indeed, careful scrutiny of the record does not demonstrate particularized suspicion for DUI at any time until *after* the administration of the tests. The District Court labored under a misconception that Brunette's failure to use a turn signal was objective evidence that *by itself* established particularized suspicion sufficient under § 61-8-403(4)(a)(i), MCA. In doing so, it failed to proceed further in judging and weighing the credibility of evidence to determine if it properly escalated into a particularized suspicion for administration of sobriety tests, particularized suspicion that Brunette was driving under the influence, and probable cause for Brunette's arrest for driving under the influence. This Court errs by supplanting the District Court's decision with its own and adding facts which were contested and at the heart of these proceedings—and, ultimately, the job of the District Court to resolve and evaluate within the proper legal framework.

¶40 We held in *Hulse* that field sobriety tests were searches that must be supported by particularized suspicion to believe the driver was intoxicated when operating a vehicle.

20

*Hulse*, ¶ 38. We observed that an investigative stop for offenses which were not related to driving under the influence could nonetheless escalate into particularized suspicion.

> Once a lawful stop is made, a police officer's suspicions may become further aroused and the stop may become further prolonged and the scope enlarged as required by the circumstances, *provided the scope of the investigation remains within the limits created by the facts upon which the stop is predicated and the suspicion which they arouse.*

*Hulse*, ¶ 40 (emphasis supplied). We provided, by way of example, that if "an officer only observed an individual driving with a broken taillight and after making his initial stop he did not observe any signs of intoxication, he would not have particularized suspicion that the driver was driving under the influence, and, therefore, would be prohibited from administering field sobriety tests." *Hulse*, ¶ 40.

¶41 Here, it was the task of the District Court, and not this Court, to assess the credibility of those facts which would support escalation into particularized suspicion for a belief that Brunette was driving under the influence. While the basis for the initial stop was undisputedly Brunette's failure to use a turn signal, the District Court did not, either verbally or in the court's written order, assess, evaluate, or weigh the credibility of facts which would warrant the development of particularized suspicion that Brunette was driving while intoxicated. Indeed, it was highly contested whether the officer had any grounds to suspect Brunette was driving under the influence and whether the stop was pretextual. There was uncontested evidence that law enforcement made no observations of erratic driving, straddling the center line, wide turns, unnecessary acceleration or deceleration, stopping problems, etc. Indeed, the officer agreed that Brunette did not appear to have any driving problems at all. The pretextual nature of the initial stop, when

21

the deprivation period was begun, and running the out-of-state license plates over forty minutes before making the stop were clearly troubling to the court.[1]  In the context of these types of credibility issues, and the absence of any oral or written findings beyond Brunette's failure to use a turn signal and test refusal, this Court errs in stepping into the shoes of the trial court and making those "implied" findings or misconstruing statements of the court into "oral findings."  The District Court's remarks regarding watery eyes and a PBT were offered to guide counsel in the submission of its supplemental briefing, and cannot be construed as "oral findings" of the court to supplement its written order.  Opinion, ¶ 33.  Furthermore, the record does not establish at what point the officer made the observation of "watery eyes" and whether it was, in fact, part of the escalation into particularized suspicion for the sobriety tests and a belief that Brunette was driving under the influence.  Significantly, the District Court made no finding that Brunette had any odor of alcoholic beverage, as this Court does, and stated on the record that he had "some concerns about [the] officer's conduct."  The District Court's singular focus on the objective nature of Brunette's failure to use his turn signal strongly suggests that it deemed much of the officer's other testimony as untrustworthy and questionable.  Such a belief was warranted given the circumstances of the investigation and, indeed, one of the

---

[1]  Also, Brunette presented evidence that some, if not all, of the field sobriety tests were unreliable because he suffered from two brain tumors which affected his hearing and likely his balance.  There was also testimony that during the deprivation period and contrary to law enforcement procedure the officer stood outside his patrol car while Brunette was seated inside, making it unlikely the officer could observe or hear whether Brunette "belched" thus rendering the preliminary breath test unreliable.  Finally, Brunette who was a Wisconsin native employed by Global Energy Services on a wind farm in Glacier County, was driving a company vehicle with Texas license plates.  Brunette was unfamiliar with where the registration was located within the vehicle.  The District Court did not address any of this evidence in its order.

22

bases for the stop—swerving and nearly crashing into another vehicle—evaporated following the officer's observation during the hearing of his in-car video. The Court errs by attributing credibility to facts necessary to substantiate reasonable suspicion when the District Court refrained from doing so.

¶42 In a proceeding to reinstate a driver's license pursuant to § 61-8-403(4)(a)(i), MCA, the court is limited to considering whether law enforcement had particularized suspicion to believe that the person had been driving while under the influence. The District Court's singular conclusion that Brunette made a turn without using a turn single is insufficient to establish particularized suspicion to believe Brunette was driving under the influence. The District Court does not articulate those facts giving rise to an escalation of the stop and which would establish particularized suspicion for the administration of field sobriety tests and reasonable grounds to believe that Brunette was driving while under the influence. To the extent we misconstrue the District Court's order and add to its findings, I dissent.

/S/ LAURIE McKINNON

Justice Michael E Wheat joins the dissenting opinion of Justice Laurie McKinnon.

/S/ MICHAEL E WHEAT

23